# Illinois Official Reports

## Appellate Court

---

*In re Commitment of Gavin*, 2014 IL App (1st) 122918

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF EDWARD GAVIN (The People of the State of Illinois, Petitioner-Appellee, v. Edward Gavin, Respondent-Appellant). |
| District & No. | First District, Third Division<br>Docket No. 1-12-2918 |
| Filed<br>Rehearing denied | June 30, 2014<br>July 28, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A jury's finding that respondent was a sexually violent person under the Sexually Violent Persons Commitment Act was reversed and the cause was remanded for a new trial where the jury could have found otherwise based on the evidence and the arguments if it had not been subjected to the extreme sarcasm and mockery the prosecution resorted to in its arguments and its reference to the facts underlying respondent's deviancy and offenses for the truth of the matter asserted, especially in view of respondent's failure to manifest any symptoms of paraphilia since 1991. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 06-CR-80009; the Hon. Michael B. McHale, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on Appeal

Daniel T. Coyne, Matthew Daniels, Michael Johnson, and Ian Barnes, all of Law Offices of Chicago-Kent College of Law, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Chicago (Michael M. Glick and Lindsay Beyer Payne, Assistant Attorneys General, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justices Neville and Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1      Proceedings under the Sexually Violent Persons Commitment Act (SVP Act) identify individuals who are dangerous due to mental disorders that would predispose them to sexual violence and forces them into treatment for their own good and for the safety of society. 725 ILCS 207/1 *et seq.* (West 2010). Respondent Edward Gavin appeals a jury's finding that he is a sexually violent person under the SVP Act, arguing (i) he was improperly limited during his *voir dire* of the jury; (ii) the evidence failed to prove he met the definition of a sexually violent person; (iii) the State's opening statement and closing arguments were improper and so prejudicial as to require a new trial; and (iv) the trial court erred when it would not hold a proper dispositional hearing.

¶ 2      We reverse and remand for a new trial on the grounds that the State in both its opening remarks and closing arguments made sarcastic and otherwise highly improper and prejudicial statements about Gavin and his attorney that denied Gavin of his right to a fair trial.

¶ 3                           BACKGROUND

¶ 4      As is common with commitment proceedings under the SVP Act, only expert witnesses testified. We recite the facts with an understanding that the experts testified without personal knowledge of most of the facts other than some statements made by Gavin during an interview. See Ill. R. Evid. 801(d)(2)(A) (eff. Jan 1, 2011). What follows summarizes the experts' testimony.

¶ 5      Gavin, born in 1958, began using alcohol when he was only eight years old. He has a history of alcohol, marijuana, heroin, and cocaine use. He had been sent to juvenile detention by the time he was 14, and later dropped out of high school. In 1975, at age 17, Gavin raped

a 14-year-old girl. That same day, he attempted to rape a 21-year-old woman. He pleaded guilty to both the rape and the attempted rape, and was given a four- to six-year sentence. He was later released on parole. In 1980, Gavin was referred for substance abuse treatment, but it is unclear whether he attended any treatment sessions. That year, Gavin tried to rape another woman and was subsequently charged, convicted, and sentenced to 12 years in the penitentiary on the attempted rape. He received six months of sex offender treatment while in the Department of Corrections (DOC), but did not complete the program.

¶ 6    In 1988, having been released early, Gavin went to a hotel where he spent the day with prostitutes, drinking, and using drugs. Physically unable to finish sex with the prostitutes, he raped and robbed a 48-year-old hotel maid. Charged with aggravated criminal sexual assault and attempted armed robbery, he pleaded guilty and received a 15-year sentence.

¶ 7    While on parole in 1996, Gavin attended monthly sex offender treatment for a year, but did not complete the program. Later, Gavin committed a burglary for which he was convicted and returned to the custody of the DOC.

¶ 8    During his incarcerations, prison authorities issued Gavin 36 disciplinary write-ups for breaking prison rules, 3 of them for sexual misconduct. DOC records indicate that Gavin made inappropriate comments to female staff members, fondled his genitals in front of a female doctor, refused to cover his genitals while in the hospital, asked female staffers to have a long-term relationship with him, and–in 1991–forced his way into the office of the female school principal, attacked her, fondling her and kissing her neck, until a correctional officer and two inmates pulled him off. Authorities put Gavin in segregation between 12 and 15 times.

¶ 9    In 2006, the State filed a petition to commit Gavin as a sexually violent person under the SVP Act. During pretrial proceedings, the court placed Gavin in the custody of the Department of Human Services (DHS). Since then, he has not received any tickets for sexual misconduct, though he was found to have two pornographic videos and marijuana. He also has refused sex offender treatment at DHS.

¶ 10    The circuit court conducted a jury trial on the petition in 2012. Before trial, Gavin submitted proposed jury questions for *voir dire*, including, "You will hear evidence that Mr. Gavin has been convicted of indecent liberties with a child. How would that affect your decision in this case?" The trial court did not allow Gavin to inquire about his specific arrests and convictions, but allowed him to ask the jury whether they could be fair given his four convictions for "sexually violent offenses." When asked during *voir dire*, the jurors indicated that these convictions would not affect their fairness.

¶ 11    During opening statement, the State attempted to argue the facts surrounding Gavin's previous sex crimes as though those facts would be in evidence.

> "MS. WELKIE [Assistant State's Attorney]: *** [The experts] look at these patterns of behavior that they see in this individual's background. And the patterns of behavior, just some of them, I will give you now, that they relied on to form their opinion.
>
> *** [W]hat you're going to hear during the testimony today from the doctors is that on a day in 1975 *** this respondent committed not one but two sexually violent offenses. In the same location in a CHS building, in a Chicago public housing building, in an elevator. The first one happens at about 4:50 in the evening. A

21-year-old women [*sic*] gets on the elevator, the respondent is in the elevator with her, and he rips off her blouse and fondles her breast. \*\*\* Just over two hours later in the exact same elevator, in the exact same building, he attacks a 14 year old. This time he's able to stop the elevator between floors and he's able to make the 14 year old undress, and he rapes her in the elevator."

Gavin objected to the State's portrayal, and the court overruled him. The State continued:

"MS. WELKIE: \*\*\* In 1980, you're going to hear in the same CHA housing building he \*\*\* grabbed a 15 or 16 year old girl–

MR. COYNE [Gavin's counsel]: We would object.

MS. WELKIE: –and he began to rape–

THE COURT: Overruled.

MS. WELKIE: –her.

THE COURT: Actually sustained. Rephrase.

MS. WELKIE: When he was in the CHA building, the same building, that he was in where he committed the first two from 1975 he's on parole for them, a girl who is either 15 or 16 years old, he assaults her. He grabs her and he–

MR. COYNE: Same objection, Judge.

MS. WELKIE:–and she is screaming. He pulls her down and–

THE COURT: Overruled.

MS. WELKIE:–and he is attempted to penetrate her vagina with his penis. This is viewed by the Chicago Police Department officers. They come up to try to aid her. He is so intent his–what you're gonna hear is that–

MR. COYNE: Objection.

MS. WELKIE:–his sexual urges–

THE COURT: All right. Let's have a side bar.

At side bar, the court sustained Gavin's objection, and instructed the State to tell the jury that these facts of Gavin's sex crimes would only come in to show the basis of the State's experts' opinions. Gavin requested a curative instruction, which the trial judge refused because he did not believe the jury had been prejudiced. The State then retold the facts of Gavin's 1980 conviction:

"MS. WELKIE: So 1980, the doctors are going to tell you that they relied on the fact that in his 1980 conviction, he's in the same Chicago Housing Authority, that he grabs a victim a 15 or 16 year old girl, he pulls her down. He's trying to rape her. He is trying to place his penis in his [sic] vagina. That sexual urge that the doctors are going to tell you about in their diagnosis as being evidenced by this.

And the doctors are going to tell you that in the evidence of the sexually violent offense, the police approach. They on view see him sexually assaulting her or attempting to sexually assault this girl. They have to beat him over the head to get him off of her. That is what the evidence through the doctors and what the doctors relied upon is going to show. And all of this while he is on probation for the sexually violent offense from 1975."

¶ 12    Gavin did not object, and the State continued:

"But his sexual offending didn't stop there, and the behaviors that the doctors are relying upon did not stop there. He continues to offend and in 1988, when he is now approximately 29 years old, I believe, he commits another sexually violent offense, and that's aggravated criminal sexual assault.

In that case he attacks a 48-year-old woman, a maid from a hotel. He does so in the hotel room. And he is armed with some type of block of wood. He forces sexual intercourse upon her, and the doctors will tell you that *** the reports that they read said that he also riffled through her purse and demanded money from her.

So this sexual behavior, this pattern of sexual behavior that the doctors observed is what lends itself to their diagnoses, is what you're going to hear, of the paraphilia not otherwise specified, and also the antisocial personality disorder. And those are only some of the behaviors that they're going to tell you about during the trial."

¶ 13    During its case-in-chief, the State called two expert witnesses: Dr. Vasiliki Tsoflias, a forensic psychologist, and Dr. Kimberly Weitl, a psychologist, to testify as experts in clinical and forensic psychology, and in the evaluation, treatment, and risk analysis of sex offenders. Both experts examined Gavin's records from the DOC and DHS, police reports, court documents, attorney statements, and reports from other mental health professionals. Gavin refused to be interviewed by Tsoflias, but consented to an interview with Weitl.

¶ 14    Referring to the Diagnostic and Statistical Manual of Mental Disorders, fourth edition text revision (DSM-IV-TR), both experts diagnosed Gavin with paraphilia, not otherwise specified, nonconsent (PNOS nonconsent). Tsoflias diagnosed Gavin with a personality disorder, not otherwise specified, with antisocial and narcissistic features, while Weitl diagnosed him with antisocial personality disorder. The DSM-IV-TR generally defines paraphilia as "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors generally involving 1) nonhuman objects, 2) the suffering or humiliation of oneself or one's partner, or 3) children or other nonconsenting persons, that occur over a period of at least 6 months." Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 566 (4th ed., text rev. 2000). The experts testified that none of these disorders will resolve themselves and, accordingly, require treatment.

¶ 15    PNOS nonconsent, while commonly accepted in the mental health community, is a controversial diagnosis and is sometimes made in error. The diagnosis cannot be based solely on the commission of multiple rapes, but the experts believed the diagnosis to be justified here. Tsoflias believed Gavin met the criteria for PNOS nonconsent because he had, on multiple occasions, forced women to have sex with him since the age of 16. She based this diagnosis on his conduct between 1975 and 1991, but admitted that from 1991 to 2012 Gavin has not committed any sex crimes. She also opined that (i) as a result of uncontrollable urges for nonconsensual sex, Gavin spent most of his life in prison; and (ii) Gavin had a pattern of substance abuse before committing sexual crimes, which made him less able to control his behavior.

¶ 16    As to the personality disorder diagnosis, the disorder is defined as "personality or characteristics that are not considered normal in [the person's] culture *** that interfere with their ability to interact with others or impair their function." Tsoflias opined that Gavin's personality disorder manifested itself by his "repeatedly engaging in behaviors that are grounds for arrest," and that he "shows a lack of concern for the safety of others, *** exhibited through his violent acts and his disregard for the consequences that his acts have on

- 5 -

his victims." Tsoflias admitted that the personality disorder alone would not satisfy the SVP Act's element of a mental disorder, but that the two diagnoses work together, with the personality disorder causing Gavin to disregard the law and the safety of others, and the PNOS nonconsent making him desirous of nonconsensual sex.

¶ 17    The experts used two actuarial instruments to determine Gavin's risk of sexually reoffending: the Static 99R and the Minnesota Sex Offender Screening Tool-Revised (MnSOST-R). The Static 99R examines several static characteristics associated with the risk of sexually reoffending. The MnSOST-R looks at several static and dynamic factors to do the same. Both instruments have only moderate predictive accuracy. Under both measures Gavin fit in the high-risk category.

¶ 18    Weitl noted that other sex offenders who scored as high as Gavin on the MnSOST-R recidivated at a rate of 74% within six years. The MnSOST-R has been criticized for having a small sample size. Moreover, some experts in the field question its predictive accuracy because most individuals that it places in a high-risk category are civilly committed and cannot be further studied. Other sex offenders who scored similarly to Gavin on the Static 99-R, sexually recidivated at a rate of 37.9% within 5 years, and 48.6% within 10.

¶ 19    Weitl also had Gavin take the Multiphasic Sexual Inventory II (MSI-II). That test showed Gavin's thinking and behaviors in the average range compared to other men convicted of rape, and that he has trouble understanding his urges and fantasies.

¶ 20    The experts also considered other dynamic and protective risk factors, which increase or decrease the chance a person will sexually reoffend. Among the factors increasing the risk of reoffending are that Gavin (i) committed sexual offenses as a minor and as an adult; (ii) exhibited antisocial behavior beginning at a young age; (iii) never completed sex offender treatment; (iv) has problems with intimacy, never having been married or in a long-term relationship; (v) has a criminal lifestyle; (vi) has violated his parole; (vii) cannot control his behavior; (viii) has a history of violence; (ix) has deviant sexual interest in nonconsensual sex; (x) seems unable to control his behavior; (xi) uses pornography and prostitution; (xii) has anti-social personality disorder; and (xiii) is a substance abuser who was intoxicated when he committed sex offenses. The experts opined that each of these factors increases the chance that Gavin would sexually reoffend.

¶ 21    According to the State's experts, there were no protective factors that decreased Gavin's likelihood of reoffending. Protective factors include the completion of sex offender treatment, having a debilitating illness with less than 15 years to live, and living in the community for a significant time without reoffending. Both experts admitted that Gavin's arrest while on parole in 1996 did not involve any sexual offenses. Moreover, Gavin suffers from high blood pressure, diabetes, hypertension, hyperthyroidism, and osteoarthritis in his right hand. Some of the conditions are controlled by medication. Neither expert considered these diseases as protective factors because they were not life-threatening. But they could not say how any of the conditions specifically affected Gavin's likelihood of reoffending. Moreover, Gavin's records from DHS indicate that he has "asymptomatic ischemic changes on his EKG," but the experts did not know what that meant and did not consider it as a protective factor.

¶ 22    Gavin had a right orchiectomy, the removal of his right testicle, in 1997. Neither expert considered this a protective factor. But they did not consult with any physicians to determine whether the removal of one testicle would alter Gavin's sexual desires. Gavin also needs to

have his hip replaced after suffering severe degenerative damage. He now uses a handicap shower, a lower bunk, walks with a cane, and is on "unassigned" work status. The experts did not consider any of these to be protective factors because, they opined, a medical condition could reduce the risk of sexual recidivism only if it was untreatable and would kill the individual within 15 years.

¶ 23 Based on the actuarial instruments, and the dynamic and protective risk factors, the experts believed there to be a substantial probability that Gavin will engage in future acts of sexual violence.

¶ 24 Early in Weitl's testimony, the trial court instructed the jury:

"The same as the last doctor, folks. I'm allowing this witness to testify, in part, to records including but not limited to police reports, Department of Corrections records, Department of Human Services records, psychological evaluations, psychological articles and statements, other than those made by the respondent to this witness.

These materials are not being admitted into evidence. The testimony is being allowed for a limited purpose. It's being allowed so that the witness may tell you what she relied on to form her opinion. The material being referred to is not evidence in this case and may not be considered by you as evidence. You may consider the material for the purpose of deciding what weight, if any, you'll give the opinions testified to by this witness."

¶ 25 Gavin presented no evidence during his case-in-chief.

¶ 26 Before closing arguments, the trial judge instructed the jury the arguments are not evidence. During closing arguments, the State again referred to the facts of Gavin's sex crimes:

"MS. RIVERS: *** So you heard from two doctors. And what both of them told you was that the respondent was [a sexually violent person]. ***

They looked at his total criminal history. They read all of his records that were in front of them. And when they did, they came to the conclusion that I believe you will. When looking at his criminal history it went all the way back to 1974. Where a ten year old was grabbed by the respondent.

Then in 1975 the respondent was convicted. Remember he went into an elevator where a 14 year old was, and he raped that 14 year old. He was convicted of raping that 14 year old. Earlier that day *** he attempted to rape another woman who was 21, and he was convicted of that offense.

Mr. Gavin goes to prison for those two offenses, and he stays there for a few years, but by 1980 he's on parole. And when he's on parole he attempts to rape another woman. As a matter of fact, he was convicted by a jury for attempting to pull a 15 or 16 year old down the hall that took police officers to bang him on the head with a gun in order for him to stop his–

MR. COYNE: Judge, objection.

THE COURT: Overruled. Ladies and gentlemen, you should rely on your own recollection of the evidence.

Go ahead.

MS. RIVERS: In order for him to stop his attempted rape on her. Mr. Gavin was again convicted and sentenced and spent time in prison.

By 1988, Mr. Gavin was out again, and this time after being with prostitutes he finds a maid in the hotel that he was in, who was doing her job, a 48-year-old woman, and there he commits aggravated sexual assault where he forces her.

MR. COYNE: Same objection, Judge.

THE COURT: Let's have a side bar."

¶ 27 At side bar, the trial judge overruled the objection and admonished the State not to represent the facts of Gavin's crimes as substantive evidence. The court noted that it did not think the jury had been prejudiced yet. The State continued its argument:

"MS. RIVERS: *** I would like to bring your attention back to what the doctors relied on when they came to the conclusion that the respondent is a sexually violent person.

One of the things that they looked at was that in 1988, after being released from the 1980 case, the respondent, after a full day of, or a day where he had prostitutes with him, he goes to and he does sexually offend against a 48-year-old maid at the hotel.

The doctors didn't just look at that. They continued. They looked at, again, all of his records. Dr. Weitl told you, and so did Dr. Tsoflias, that while in the [DOC], the respondent continued to sexually act out."

The State then described Gavin's disciplinary problems in prison. It then went on to argue how Gavin's crimes are indicative of his mental disorders and discuss the risk analysis measures the experts performed:

"[The experts] diagnosed the respondent with mental disorders.

Now, the first one they agreed hundred percent on. The paraphilia not otherwise specified, sexually attracted to non-consenting persons. And you see their logic when you look back at the criminal cases. It's their intent [*sic*] reoccurring that occurs over a six-month period to act out either actions or fantasies.

And when you look back at the criminal history, you see it started in 1974. It went from '74 to '80, to '88, to '90. Clearly it was continuing beyond, well, well beyond the six months. And clearly, they were intense enough that he had to be hit on the head with a gun in order to be removed from one of his victims.

***

And what they told you about antisocial personality disorder was that it is a pervasive pattern of failing to follow social norms.

Well, we have that through the history of Mr. Gavin. We have burglaries, we have aliases, we have batteries, and of course there are the sex offenses. So *** they found these traits, and gave him that diagnosis."

¶ 28 Gavin argued that the State had not proven beyond a reasonable doubt that he was a sexually violent person. He noted that he had not sexually offended since 1991. He pointed to the expert's failure to investigate or consider his medical conditions, and their reliance on inaccurate risk assessment tools.

¶ 29    During rebuttal, the State argued that "when you [the jury] go back to the room and you begin deliberations, you've heard this evidence and that presumption [that Gavin is not a sexually violent person] is now gone." Gavin objected, and the court sustained the objection and told the jury to disregard the comment.

¶ 30    The State continued, describing Gavin's argument as "twisting," "disingenuous," and "ridiculous." Gavin objected, and the court overruled the objection. The State then continued, referring to the facts underlying Gavin's convictions as substantive evidence:

> "MS. WELKIE: Counsel wants you to believe that since 1991, when he took a woman from, when his sexual urges and desires forced a women [*sic*], who was employed by the [DOC] as a principal or school teacher into room down to the ground fondling her and kissing her, and he was reprimanded for it and got a ticket for it because since that date he hasn't forced another woman to the ground–
>
> MR. COYNE: Objection.
>
> THE COURT: Overruled.
>
> MS. WELKIE: –somehow this paraphilia not otherwise specified has gone away. That is absolutely against the manifest weight of the evidence. \*\*\*
>
> We have met our burden. You heard these are lifelong chronic conditions that do not go away. And they can only be dealt with effectively with treatment and treatment he hasn't had.
>
> And look at his, look at his time in the [DOC]. \*\*\* He gets three sexual misconduct tickets for having his genitals out in front of people, telling people he wants to be in a long-term relationships, attempting to assault someone \*\*\* as you heard from what to doctors relied upon, to the fact that it took correctional guards and other inmates, multiple people, to pull him off of this woman. Just as he had to be, as you heard the doctors relied upon, pulled off of that girl back in 1980. These are urges that run strong."

¶ 31    Regarding the effects of Gavin's health on his risk to sexually reoffend, the State argued:

> "Let's get real here. The doctors have told you that it's a debilitating condition, debilitating conditions, that are the types of conditions that they are looking at to overcome this overwhelming evidence of risk. \*\*\* [W]hen you go back into that jury room, you don't have to leave your common experience and your commonsense at the door. You take it back with you.
>
> And here is the list of what is supposedly so debilitating, according to Counsel, that it would justify lowering his risk \*\*\* hypertension. Oh, there's a stopper. Because how many people in the United States right now suffer from hypertension and have to go to work every day, and have to have it controlled by medication?
>
> \*\*\* [T]hen the fact that he has only one testicle. Well, oh, my gosh, I'm glad no one told Lance Armstrong that you can't ever accomplish your goals, and in his case his goals are raping people \*\*\*.
>
> There's the fact that he is all of 53 years old. Well, my goodness. Fifty-three years old. Isn't he old? Born in 1958. Well, you know what, here's the class he's with from 1958. Madonna, Evelyn [*sic*] Degeneres, Tim Burton, Gary Altman, Alex Baldwin, Drew Carey, Tim Robbins, Kevin Bacon is six days older than him, and Barb Cuban is seventeen days older than him. Oh, wow, that age and those disabilities are really,

really, really, really, really, going to be able to cause a protective factor enough to be able to knock down the amount of risk in this case."

The State also characterized Gavin's arguments as an attempt to disregard the testimony of both experts. "[W]hat they're asking you to do is to throw out the testimony of two experienced, educated, and trained psychologists, doctors, experts, people that they stipulated were experts in this area ***. That's ridiculous."

¶ 32 After argument, the court instructed the jury that evidence "received for a limited purpose should not be considered by you for any other purpose." The court reiterated to the jury that they could give the expert opinions any weight they wished, and that the underlying basis of the expert's opinions was only admitted to help determine that weight.

¶ 33 As the jury deliberated, Gavin moved for a mistrial, arguing that (i) the State's sarcastic tone was inappropriate, (ii) the State attempted to diminish its burden of proof, and (iii) the State made inappropriate, personal attacks on Gavin's counsel. While the court acknowledged the State's sarcastic tone, it denied the motion.

¶ 34 The jury found Gavin to be a sexually violent person under the SVP Act. The State then requested an immediate disposition. Gavin argued that an initial commitment order was proper, but the court should hold a separate dispositional hearing to determine whether Gavin could be subject to conditional release. The court declined to hold a dispositional hearing and, based on the evidence at trial, committed Gavin to a secure treatment and detention facility. Gavin later moved for a new trial, which the court denied. Gavin timely appeals.

¶ 35                                                    ANALYSIS

¶ 36 Gavin appeals on four grounds: (i) the court improperly limited his *voir dire* of the jury; (ii) the evidence failed to establish that he was a sexually violent person under the SVP Act; (iii) the State made improper remarks during its opening and closing; and (iv) the trial court erred in failing to hold a dispositional hearing. While we reverse on the third issue and remand for a new trial, we will address the first issue on the *voir dire*.

¶ 37                                                    *Voir Dire*

¶ 38 Gavin argues that he should have been allowed to ask whether the potential jurors could be fair and impartial given (i) he had been convicted of aggravated criminal sexual assault, attempted rape, rape, and indecent liberties with a child; and (ii) he had sexually offended against a juvenile. The trial court disagreed and only allowed him to ask whether jurors could be fair and impartial knowing Gavin was convicted of sexually violent offenses four times. Under the circumstances, we find the *voir dire* limitation reasonable.

¶ 39 When impaneling a jury in a civil case, the Illinois Supreme Court Rules provide that the trial judge conduct the *voir dire* examination of prospective jurors and question them on matters touching their qualifications to serve in the case. Ill. S. Ct. R. 234 (eff. May 1, 1997). "One of the purposes of *voir dire* is to filter out those potential jurors who are either unable or unwilling to be fair and impartial." *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 44. "[V]oir dire is not to be used to indoctrinate jurors or to impanel a jury with a particular predisposition" or "ascertain prospective jurors' opinions with respect to evidence to be presented at trial." (Internal quotation marks omitted.) *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 17.

¶ 40    Where a trial deals with a controversial subject matter, prospective jurors should be questioned about the controversial subject matter to elicit facts of possible bias or prejudice regarding the controversial subject matter. See *id.* ¶ 23. But it is inappropriate to use *voir dire* to gauge the potential juror's reactions to specific evidence. *Id.* ¶ 21. The manner and scope of *voir dire*–including whether to allow counsel's supplemental questions–rests within the trial court's sound discretion. *Id.* ¶ 15.

¶ 41    We review the limitations on supplemental questions for an abuse of discretion, and will reverse only when the trial court's conduct thwarts the selection of an impartial jury. *Id.*; see, *e.g.*, *In re Commitment of Hill*, 334 S.W.3d 226 (Tex. 2011) (questions on bias toward homosexuals proper and should have been allowed). "So long as the procedures employed by the circuit court provided a reasonable insurance that prejudice, if any, would be discovered, the court's exercise of discretion would be upheld." *People v. Allen*, 313 Ill. App. 3d 842, 845-46 (2000).

¶ 42    For instance, in *In re Commitment of Butler*, 2013 IL App (1st) 113606, the State filed a petition to commit Butler as a sexually violent person. *Id.* ¶ 3. The trial court did not allow Butler to ask the jurors if they could be fair given that he had been convicted of three sexually violent offenses. *Id.* ¶ 14. Instead, the court only allowed the respondent to ask, " 'Knowing that Mr. Butler has already been convicted of a sexually violent offense, can you be fair in determining whether or not he is a sexually violent person in this case?' " *Id.* ¶ 5. On appeal, Butler claimed this limitation–removing the number three–thwarted the selection of an impartial jury. *Id.* ¶ 14. This court disagreed, holding the trial court did not abuse its discretion in refusing to permit *voir dire* on the number of sexually violent offense, and that a "more general inquiry was sufficient to ascertain any existing bias or prejudice for sexually violent offenders that would preclude a juror from being fair and impartial." *Id.* ¶ 24.

¶ 43    Under *Butler*, the trial court does not abuse its discretion when limiting counsel's inquiry to bias arising from convictions for sexually violent offenses. See *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 24. This inquiry sufficiently allows for the discovery of bias or prejudice toward a person who commits rape or aggravated sexual assault.

¶ 44    Gavin points to the State's experts' testimony about the graphic details of Gavin's crimes, details which could evoke passion and outrage, and argues that he should have been allowed to question the potential jurors about his crimes to determine whether their nature would cause prejudice or shock. But it is not the purpose of *voir dire* to preview the evidence for the jury or to measure the jurors' reactions to certain facts. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 17. If it were, attorneys in SVP Act cases might preview the whole trial before the venire.

¶ 45    Next, Gavin argues that he should have been allowed to inquire regarding sex crimes against juveniles, which can incite passion and bias in many. See *People v. Bailey*, 249 Ill. App. 3d 79, 84 (1993) (Stouder, J., dissenting) ("There are few crimes more heinous and that evoke more outrage than sex crimes with a child victim."). Gavin maintains that the trial court should not have foreclosed inquiry into whether hearing about his child victims might cause bias or prejudice in a juror. See *People v. Strain*, 194 Ill. 2d 467, 476 (2000) ("The jurors must harbor no bias or prejudice which would prevent them from returning a verdict according to the law and evidence."). But that is not the same question Gavin wanted to ask the jury. The question Gavin sought to ask–"You will hear evidence that Mr. Gavin has been convicted of indecent liberties with a child. How would that affect your decision in this

case?"–differs. Gavin never proposed to ask potential jurors whether they could be impartial knowing that some of the victims of his sexually violent offenses were children. (The circuit court reasonably precluded the name of Gavin's crimes during *voir dire*.) Accordingly, the circuit court did not abuse its discretion in rejecting the question as posed.

¶ 46                     State's Opening Statement and Closing Arguments

¶ 47      Gavin contends the State compromised his right to a fair trial, pointing to several remarks during both the State's opening statement and closing arguments. We agree, finding the totality of the State's remarks so prejudicial that the jury admonitions could not provide a cure.

¶ 48      First, Gavin asserts that during closing argument the State diminished its presumption that Gavin is not a sexually violent person as well as its burden of proof.

¶ 49      "We will not interfere with the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 102. In proceedings under the SVP Act, the State has the burden of proving each element beyond a reasonable doubt. 725 ILCS 207/35(d)(1) (West 2010). The respondent carries a presumption during trial that he or she is not a sexually violent person. *In re Commitment of Fields*, 2012 IL App (1st) 112191, ¶ 75. The State has wide latitude in closing arguments and may comment on and draw inferences from the evidence. *People v. Miller*, 302 Ill. App. 3d 487, 495 (1998). But the State may not tell the jury that the presumption has been stripped away during its closing argument. See *People v. Keene*, 169 Ill. 2d 1, 25-26 (1995).

¶ 50      During rebuttal argument, the State argued that the presumption was "now gone." Gavin objected, and the court sustained his objection, instructing the jury to disregard the comment. Gavin urges us to find that the prejudice remained uncured despite the fact that trial court properly instructed the jury on the presumption, sustained Gavin's timely objection, and gave a curative instruction. "We find no prejudice where prompt objections were sustained and, where appropriate, the jury instructed." *People v. Wilson*, 199 Ill. App. 3d 792, 794 (1990). This was not, however, the only grave error that gives rise to potential prejudice, as we will discuss.

¶ 51      Next, Gavin complains about how the State argued that the jury would have to believe that the experts had lied to find in his favor, an impermissible argument under Illinois law. "Though the State is given wide latitude in closing arguments [citation], the State is not allowed to misstate the law or facts of the case, and it is not allowed to diminish its burden of proof [citation]." *People v. Carbajal*, 2013 IL App (2d) 111018, ¶ 29. It is improper for the State to argue that to return a verdict in favor of the respondent, the jury must believe that the State's witnesses are lying. *People v. Miller*, 302 Ill. App. 3d 487, 497 (1998). This is a misstatement of law and improperly shifts the burden of proof to the respondent, denying the respondent a fair trial. *People v. Wilson*, 199 Ill. App. 3d 792, 796 (1990). "The correct standard for consideration of the evidence *** is not whether one side is more believable, but whether, taking all of the evidence into consideration, *** every essential element of the charge has been proven beyond a reasonable doubt." *Id.* at 797.

¶ 52      In its rebuttal, the State characterized Gavin's argument as "throw[ing] out" the testimony of both experts, and "substitut[ing their] own judgment *** for all of the

- 12 -

evidence." Gavin did not object. As such, this issue is forfeit, and we review it under the criminal plain error doctrine. *People v. Curry*, 2013 IL App (4th) 120724, ¶¶ 72-73.

¶ 53     The State argues that we should apply the civil plain error doctrine to SVP Act cases. We disagree. Our supreme court has not yet decided whether the criminal or civil plain error analysis applies to proceedings under the SVP Act. See *In re Commitment of Fields*, 2012 IL App (1st) 112191, ¶ 57. Application of the plain error rule in civil proceedings is " 'exceedingly rare.' " *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 26. It applies " 'where the act complained of was a prejudicial error so egregious that it deprived the complaining party of a fair trial and substantially impaired the integrity of the judicial process.' " *Wilbourn v. Cavalenes*, 398 Ill. App. 3d 837, 856 (2010) (quoting *In re Marriage of Saheb*, 377 Ill App. 3d 615, 627 (2007)).

¶ 54     This is much stricter than the criminal plain error rule. The reason being that civil proceedings do not typically implicate sixth amendment concerns. *Id*. While proceedings under the SVP Act are civil in nature (725 ILCS 207/20 (West 2010)), they implicate sixth amendment rights, including the right to be informed of the nature of the accusation (725 ILCS 207/25(a) (West 2010)), the right to counsel (725 ILCS 207/25(c)(1) (West 2010)), the right to call and confront witnesses (725 ILCS 207/25(c)(3) (West 2010)), the right to an impartial jury (725 ILCS 207/25(d) (West 2010)), and the right to a speedy trial (725 ILCS 207/35(a) (West 2010)). These are all subjects that fall within the purview of sixth amendment guarantees. Moreover, the SVP Act gives the respondent the right against self-incrimination (725 ILCS 207/25(c)(2) (West 2010)), a fifth amendment right. All of these rights make these proceedings quasi-criminal in nature.

¶ 55     Moreover, the possibility of indefinite commitment in a secure facility places at stake a vital liberty interest, as serious as the consequences of a criminal trial. See *Kansas v. Hendricks*, 521 U.S. 346, 372 (1997) (Kennedy, J., concurring) ("the practical effect of [an SVP] law may be to impose confinement for life"); 725 ILCS 207/40(a) (West 2010) ("If a court or jury determines that the person *** is a sexually violent person, the court shall order the person to be committed *** until such time as the person is no longer a sexually violent person."); *In re Commitment of Weekly*, 2011 IL App (1st) 102276, ¶ 47; *Townes v. Commonwealth of Virginia*, 609 S.E.2d 1, 4 (Va. 2005) ("a person subjected to an involuntary civil commitment proceeding has a substantial liberty interest in avoiding confinement in a mental hospital"). Hence, proceedings under the SVP Act have much in common with criminal cases as compared to civil cases. Consequently, the criminal plain error rule should apply to appeals from SVP Act proceedings. See *In re Detention of Sveda*, 354 Ill. App. 3d 373, 377 (2004) (applying criminal plain error rule to SVP Act case); *In re Commitment of Bushong*, 351 Ill. App. 3d 807, 813-14 (2004) (same); *In re Detention of Traynoff*, 358 Ill. App. 3d 430, 444 (2005) (same).

¶ 56     The criminal plain error doctrine allows us to reach a forfeited error that affects substantial rights where: (i) the evidence is so closely balanced, the jury's guilty verdict might have resulted from the error and not the evidence; or (ii) the error is so serious the defendant was denied a substantial right and, thus, a fair trial. *People v. Ware*, 2014 IL App (1st) 120485, ¶ 14. "Our first step in plain error review is to determine whether any error occurred at all." *People v. Sullivan*, 2014 IL App (3d) 120312, ¶ 26.

¶ 57     We do not believe it was error for the State to characterize Gavin's arguments as a request to "throw out" and "ignore" all the expert testimony. The prosecution should not

- 13 -

make arguments that tend to shift the burden of proof to the respondent, like having to prove one witness or another a liar. See *People v. Miller*, 302 Ill. App. 3d 487, 497 (1998) (finding plain error where prosecutor argued that to acquit defendant jury would have to find all State's witnesses were lying). But calling a lay witness a liar is not the same as arguing that an expert's opinion and its bases are valid or invalid. "[T]he State may rely on expert witness opinion and in doing so may also explain the basis for those opinions.*" In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 36. It is proper for both parties to argue how much weight the jury should give an expert opinion, in accordance with the court's instructions. Here, after arguments, the court properly instructed the jury to give the experts' opinions "whatever weight you think [they] deserve." While the rebuttal mischaracterizes Gavin's argument, the State did not argue that the only way to find in favor of Gavin was to "throw out" the experts' testimony. Thus, no error, or plain error, occurred.

¶ 58      Gavin also accuses the State of improperly attacking his counsel during the closing for calling Gavin's arguments "twisting and disingenuous." The court overruled Gavin's objection to these remarks."Unless predicated on evidence that defense counsel behaved unethically, it is improper for a prosecutor to accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception." *People v. Johnson*, 208 Ill. 2d 53, 82 (2003).

¶ 59      In describing Gavin's argument as "twisting and disingenuous," the prosecutor did not overstep the boundary of permissible argument as set forth in *Johnson*. While the comment may be unprofessional, we do not believe it transmits a prejudicial connotation.

¶ 60      Gavin argues the State erred in saying that Gavin's counsel wanted the jury "to leave your common experience and your common sense at the door," and also made numerous sarcastic comments about Gavin's health as it relates to his risk of sexual recidivism, to which Gavin did not object at the time. As such, we review it for plain error (*People v. Curry*, 2013 IL App (4th) 120724, ¶¶ 72-73).

¶ 61      Gavin argued that he did have serious medical conditions that prevented him from reoffending. The State argued the jury did not have to abandon common sense, implying Gavin's argument was absurd. Either party may argue that an expert's opinion is contrary to or in line with common sense and that the opinion ignores or uses the best available facts. *People v. Daniels*, 391 Ill. App. 3d 750, 788 (2009). Accordingly, the State's invitation to the jury to use common sense to assess its experts was proper.

¶ 62      As to the State's use of sarcasm, we again review for plain error. The trial court acknowledged that "there was a note of sarcasm throughout some of the argument by Ms. Welkie, which in [its] opinion having been in [the criminal] courthouse for now going on 20 years, [it did not] find all that uncommon." Nevertheless, courts often condone sarcasm. The prosecutor's words themselves indicate an extreme level of sarcasm, and we can only imagine the inflection, tone, and manner in which the words were delivered. By making light of a serious issue at the penultimate point of the trial, what comes across in the transcript is not argument as much as ridicule and derision at its harshest. This is not only offensive; it also is unprofessional. See *People v. Burton*, 338 Ill. App. 3d 406, 418 (2003); see *People v. Moss*, 205 Ill. 2d 139, 174-75 (2001) (McMorrow, J., specially concurring) (describing sarcasm as improper and unprofessional).

¶ 63      We are aware that "it is entirely proper for a prosecutor to denounce a defendant's wickedness, engage in some degree of invective, and draw inferences unfavorable to the

defendant if such inferences are based upon the evidence." (Internal quotation marks omitted.) *Burton*, 338 Ill. App. 3d at 418. But we believe in this case the prosecution went too far. *Cf. id.* at 418-19 (finding no error where remarks were "not out of proportion to what the jury properly considered as evidence").

¶ 64 This is that rare case where, in the heat of closing, the State's arguments reached the extreme, crossed over from merely tough talk into the realm of inflammatory rhetoric designed to improperly appeal to the juror's emotions. Though denominated a civil proceeding, the deprivation of Gavin's liberty is at stake, and we look at criminal, rather than civil, jurisprudence for guidance. As an aside, we cannot ignore the extreme reluctance of trial judges to declare a mistrial for misdeeds similar to those here. Trial judges in these situations have been known to say either out loud or to themselves that the appellate court will "figure it out later."

¶ 65 Most of the prosecutor's sarcasm concerned the effect of Gavin's health problems on his risk of sexually reoffending. Her comments included: "Let's get real here. *** Oh, there's a stopper. Because how many people in the United States right now suffer from hypertension. *** Well, oh, my gosh, I'm glad no one told Lance Armstrong that you can't ever accomplish your goals, and in his [Gavin's] case his goals are raping people ***. Well, my goodness. Fifty-three years old. Isn't he old? Born in 1958. Well, you know what, here's the class he's with from 1958. [List of celebrities] *** Oh, wow, that age and those disabilities are really, really, really, really, really, going to be able to cause a protective factor ***." The record is replete with this kind of incendiary language. The State's rebuttal was disproportionately sarcastic and not based on the evidence. See *Burton*, 338 Ill. App. 3d at 418-19 (finding no error where remarks were "not out of proportion to what the jury properly considered as evidence"). Moreover, the State's reference to celebrities had nothing to do with the issues in the case, nor was there any way for the jury to confirm its accuracy.

¶ 66 The prosecution must be above this kind of mockery. It is one thing to point out an illogical argument. It is another, much more damaging and prejudicial route, to continuously mock the respondent, an individual who, according to the State, has an abnormal and dangerous mental illness. Doing so inflames the passions of the jury and distracts it from properly considering the evidence of Gavin's risk of sexual recidivism. We will consider this error in light of the others.

¶ 67 Gavin next asserts that the State should not have been allowed to argue the facts of Gavin's sex crimes as substantive evidence. We agree. We review evidentiary rulings for an abuse of discretion, which will be found only where the trial court's ruling is "arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." (Internal quotation marks omitted.) *In re Commitment of Doherty*, 403 Ill. App. 3d 615, 621 (2010). The trial court is granted great discretion in these rulings to ensure that the jury will not be misled or deceived into using evidence for an improper purpose. The judge should take special care in conducting jury trials under the SVP Act to ensure that the jury's verdict is not used to punish the respondent for his past crimes. See *In re Lance H.*, 2012 IL App (5th) 110244, ¶ 21 (noting dual objectives of involuntary commitment are (i) to provide care for those unable to care for themselves due to mental illness, and (ii) to protect society from dangerously mentally ill).

¶ 68 Experts may give their opinions based on facts not in evidence if the facts are of a type reasonably relied on by experts in their particular field. *People v. Nieves*, 193 Ill. 2d 513,

527-28 (2000); see Ill. R. Evid. 703 (eff. Jan. 1, 2011); Ill. R. Evid. 705 (eff. Jan. 1, 2011). The facts underlying an expert's opinion are not considered substantive evidence unless separately admitted. *In re Commitment of Doherty*, 403 Ill. App. 3d at 621. The prosecutor should not refer to this type of evidence as substantive during closing argument. *People v. Murphy*, 157 Ill. App. 3d 115, 119 (1987); see *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 36 ("In its quest to sustain its burden, the State may rely on expert witness opinion and in doing so may also explain the basis for those opinions.").

¶ 69    "A 'prosecutor's comments in closing argument will result in reversible error only when they engender "substantial prejudice" against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence.' " *People v. Kirchner*, 194 Ill. 2d 502, 549 (2000); *People v. Burton*, 338 Ill. App. 3d 406, 418 (2003) (holding argument does not prejudice jury where evidence of guilt overwhelming and argument a fair rendition of facts of the case). The challenged comments must be viewed in the context of the whole argument, and the totality of the record. See *Kirchner*, 194 Ill. 2d at 549.

¶ 70    The State argues that this court's opinion in *In re Commitment of Butler*, 2013 IL App (1st) 113606, indicates that the prosecutor did not err. We disagree. *Butler* is distinguishable in two ways. First, unlike here, the prosecutors in *Butler* framed the facts underlying the respondent's past convictions as a " 'deviant pattern' " of behavior the experts relied on in reaching their diagnosis. *Id.* ¶ 33. While there might have been some avoidable prejudice arising from the *Butler* prosecutors' depiction of the substantive facts, they qualified their remarks by repeatedly referencing the doctor experts' reliance on the substantive facts.

¶ 71    Here, the State insufficiently tied the underlying facts to the testimony that Gavin had a mental disorder. For example, regarding PNOS nonconsent, the State argued, "when you look back at the criminal history, you see it started in 1974. It went from '74 to '80, to '88, to '90. Clearly it was continuing beyond, well, well beyond the six months. And clearly, they were intense enough that he had to be hit on the head with a gun in order to be removed from one of his victims." Regarding the antisocial personality disorder, the State argued, "We have burglaries, we have aliases, we have batteries, and of course there are the sex offenses. So *** they found these traits, and gave him that diagnosis."

¶ 72    An expert may disclose hearsay " 'for the limited purpose of explaining the basis for his [or her] opinion.' " *In re Detention of Hunter*, 2013 IL App (4th) 120299, ¶ 32 (quoting *People v. Nieves*, 193 Ill. 2d 513, 528 (2000)). In SVP Act cases, the rubric of DSM-IV-TR allows experts to diagnose paraphilia based on a person's behavior. See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 566 (4th ed., text rev. 2000). Thus, the details of Gavin's crimes inform the experts' diagnosis of PNOS nonconsent. *In re Detention of Hardin*, 391 Ill. App. 3d 211, 219-20 (2009).

¶ 73    But the State repeatedly referred to the underlying facts as something other than the basis for the experts' opinions. For example, the prosecutors stated that the experts were going to "tell" or "show" the jury about Gavin's past sex crimes. The prosecutors referred to these hearsay statements as "facts" and "evidence." Needless to say, the experts' testimony cannot be used to show or tell about the facts underlying Gavin's crimes. None of those facts are in evidence. In fact, it is the exact opposite. Those details can only be used by the jury to assess the weight of the experts' opinions, and not for the truth of the matter asserted. *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 37 n.2 (noting admissibility of

- 16 -

facts relied on by expert not exception to the hearsay rule). For example, the fact that an expert relied on police reports or trial testimony may strengthen their opinions in the eyes of the jury. The fact that an expert interpreted medical records without medical training may do the opposite.

¶ 74   Moreover, the State argued the explicit facts underlying Gavin's convictions as a narrative. It occasionally prefaced its recitation of these details by noting that these facts were what the experts "relied on" to form their opinions. But, unlike in *Butler*, the prosecutors did not mention how the experts relied on these facts to diagnose or assess Gavin. This narration of the facts underlying Gavin's crimes, which at times reads as if Gavin was on trial for rape, was error. It misdirected the focus of the case, disconnecting the underlying facts and the experts' use of them. In other words, as a narrative, the underlying facts took on the cloak of evidence, thereby leading the jury to consider these facts independent of the expert testimony.

¶ 75   The purpose of SVP Act is to identify sexually dangerous persons and force them into treatment for their own good and for the safety of society. See *In re Lance H.*, 2012 IL App (5th) 110244, ¶ 21. Never should civil commitment proceedings be used to punish respondents for their past crimes. See *Kansas v. Hendricks*, 521 U.S. at 373 (Kennedy, J., concurring) ("while incapacitation is a goal common to both the criminal and civil systems of confinement, retribution and general deterrence are reserved for the criminal system alone"). Here, the prosecution, at the beginning and the end of the case, created substantial prejudice, encouraging the jury to consider the facts underlying Gavin's crimes as substantive evidence, amplifying the possibility that the jury would use the proceedings to punish him for his past acts. See Daniel Krauss *et al.*, *The Impact of Case Factors on Jurors' Decisions in a Sexual Violent Predator Hearing*, 20 Psychol. Pub. Pol'y & L. 135, 141 (2014) ("it is possible that jurors are double counting prior convictions in their risk estimates–once through the evidence presented on prior convictions, and again when they consider expert testimony that includes prior convictions as part of its risk estimate").

¶ 76   *Butler* is further distinguishable in that the evidence in that case was not as close as it was here. Where there is strong evidence of reasonable doubt, the effects of prejudicial acts increase exponentially. See *People v. Eddington*, 129 Ill. App. 3d 745, 780 (1984) ("misstatement of evidence *** , in a close case, can be error"). In *Butler*, it does not appear that the experts were subject to any meaningful cross-examination or that there was any weakness inherent in their testimony. See *Butler*, 2013 IL App (1st) 113606, ¶ 33. Here, Gavin's cross-examination of the State's experts indicated that they made a number of assumptions regarding Gavin's medical records, which they had no training interpreting. They admitted that Gavin has a number of ailments that affect his ability to move and to use force, but they declined to consider his illnesses a protective factor. The experts further admitted that they did not believe Gavin had committed any sexually deviant behavior since 1991, 21 years before trial. In other words, Gavin gave the jury strong reasons to disregard the experts' opinions.

¶ 77   The State further argues that the trial court's jury instruction mitigated any prejudice. We disagree. The trial court instructed the jury in accordance with Illinois Pattern Jury Instructions, Civil, No. 2.04 (2008), stating that the bases of the experts' testimony was not evidence and could only be used to evaluate their opinions. There is a strong presumption that the jurors followed the instruction of the court. *In re Detention of Lieberman*, 379 Ill.

App. 3d 585, 605 (2007). But " '[t]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.' " *Richardson v. Marsh*, 481 U.S. 200, 207 (1987) (quoting *Bruton v. United States*, 391 U.S. 123, 125 (1968). This case presents such a context.

¶ 78   The jury here was properly instructed, but the prosecutors presented their arguments in such a way to rebut the presumption that the instructions were followed. We acknowledge that this instruction, in some circumstances, is confusing. When giving it, courts are asking the jury to perform "mental gymnastics." David H. Kaye *et al.*, The New Wigmore: A Treatise on Evidence: Expert Evidence § 4.7.2 (2d ed. 2010) ("[T]he jury is told not to consider the otherwise inadmissible basis testimony for its truth. *** [T]his limiting instruction is even more troubling than most. It asks of juries something that is not just practically difficult, but logically incoherent. *** [Because] expert basis testimony is only relevant–even for the limited purpose of evaluating the expert's testimony–if it turns out to be true. If the expert's basis is false, any conclusions reached on that basis are unsubstantiated and unhelpful. To admit basis testimony for the nonhearsay purpose of jury evaluation of the experts is therefore to ignore the reality that jury evaluation of the expert requires a direct assessment of the truth of the expert's basis. Having invited the jury to make such an assessment, is it either fair or practical then to ask the jury to turn around and ignore it?"). It matters a great deal not only what the prosecutors say, but how they say it. By leaning so heavily on facts underlying Gavin's crimes, the State made the already difficult mental gymnastics of the jury nigh impossible.

¶ 79   The prosecution under the SVP Act treads a fine line, and must be prudent enough to know when its remarks regarding the respondent's past deviant sexual actions expose the jury to prejudicial matter. Moreover, it is the duty of the courts and the prosecutor to ensure that the respondent receives a fair trial. *People v. Sales*, 151 Ill. App. 3d 226, 233 (1986). In an SVP Act case, the focus should not be on the respondent's past actions, but on whether the individual's mental condition currently poses a risk of sexual recidivism. Accordingly, we believe the trial court erred in not further limiting the prosecution's recitation of the experts' basis testimony.

¶ 80                                    CONCLUSION

¶ 81   The prejudicial impact of all the prosecutorial errors mandates a new trial. *People v. Boling*, 2014 IL App (4th) 120634, ¶ 144. After the prosecution resorted to extreme sarcasm and mockery in its rebuttal and referred to the underlying facts of Gavin's history of sexual crimes and deviancy for the truth of the matter asserted, the jury could not have properly considered the evidence. This is so because the evidence and arguments in favor of Gavin are strong enough to require a new trial. Both experts admitted that they did not understand how some of Gavin's ailments specifically affected his ability to sexually recidivate. Moreover, both experts admitted that Gavin had not manifested any symptom of his paraphilia since 1991, 21 years before trial. If, absent prosecutorial misconduct, the jury had been allowed to consider the evidence and arguments, it could have found reasonable doubt that Gavin is a sexually violent person.

¶ 82   Accordingly, we reverse and remand for a new trial.

¶ 83        We decline to address the remainder of Gavin's appeal. As to the dispositional hearing, we direct the trial court to consider its procedures in light of *In re Commitment of Fields*, 2014 IL 115542.

¶ 84        Reversed and remanded.