2022 IL App (1st) 201010-U
No. 1-20-1010

FIRST DIVISION
September 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| IN RE COMMITMENT OF SIDNEY COLLINS | ) | Appeal from the Circuit Court of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | No. 10 CR 80002 |
| | ) | |
| v. | ) | |
| | ) | The Honorable |
| SIDNEY COLLINS, | ) | Paul P. Biebel, Jr., Peggy Chiampas and Michael Clancy, |
| | ) | |
| Respondent-Appellant). | | Judges Presiding. |

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Hyman and Lavin concur in the judgment.

**ORDER**

¶ 1   *Held:* The jury's decision finding respondent to be a sexually violent person under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 2012)), is affirmed. Initially, we find that we may address respondent's appeal pursuant to the collateral consequences exception to the mootness doctrine even though he was subsequently discharged from civil commitment as an SVP while his appeal is pending. Respondent's due process rights were not violated when the State followed the applicable law at the time that he filed his *habeas* petition, and his right to equal protection was not violated where he was treated as any other prisoner would have been treated. The trial court exercised appropriate discretion in the questioning of the potential jurors during *voir dire*, in barring respondent from introducing the testimony of an expert who screened respondent for civil commitment 18 years before the State filed the petition, in its decision relating

to the scope of cross-examination of the expert testimony presented by the State, and in its decision relating to the comments made by the State during closing and rebuttal arguments.

¶ 2 After a jury trial, respondent Sidney Collins was found to be a sexually violent person (SVP) pursuant to the Sexually Violent Persons Commitment Act (Act) (725 ILCS 204/1 *et seq.* (West 2018)). The circuit court committed respondent to the Illinois Department of Human Services. In this appeal, respondent asks this court to consider his appeal although he was subsequently released from commitment and further challenges the constitutionality of the petition on due process and equal protection grounds. He further challenges the trial court's decisions regarding the questions asked of the potential jurors during *voir dire*, in barring respondent from introducing the testimony of an expert who screened respondent for civil commitment 18 years before the State filed the petition, as to the scope of cross-examination of the expert testimony presented by the State and relating to the comments made by the State during closing and rebuttal arguments.

¶ 3 **BACKGROUND**

¶ 4 On June 29, 1984, respondent was arrested for having committed a rape the previous day. In 1985, respondent was convicted of this rape and was sentenced to 30 years' imprisonment, with an extended term of 30 years' imprisonment based upon the fact that the victim was 60 years old or older at the time of the commission of the offense, for a total of 60 years' imprisonment. On direct appeal, respondent challenged the sufficiency of the evidence as well as the denial of a motion to suppress his identification in a photo array and the admissibility of alleged hearsay evidence. He did not challenge the propriety of his sentence on direct appeal. This Court affirmed that judgment on direct appeal. *People v. Collins*, 176 Ill.App.3d 169 (1st Dist. 1988).

¶ 5 From 2000 to 2009, defendant challenged his extended-term sentence by filing two separate *habeas corpus* complaints and one motion to dismiss. In 2000, respondent filed a *habeas corpus*

complaint pursuant to 735 ILCS 5/10-101 in Brown County, Illinois, the county where he was incarcerated. He contended that the trial court improperly imposed an extended sentence where the victim was only 59 years old at the time of the offense and the jury did not engage in the fact finding required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The People moved to dismiss on the grounds that a sentencing error was not cognizable in a *habeas corpus* proceeding. The trial court dismissed the habeas complaint. On July 29, 2002, the Fourth District affirmed the trial court's dismissal, over a dissent, finding that "while plaintiff may otherwise be able to raise the argument his sentence is void at any time[,]" a *habeas* complaint was not the appropriate vehicle for a defendant to raise a sentencing error. *Collins v. Boyd*, 331 Ill.App.3d 475 (4th Dist. 2002)(unpublished order under Supreme Court Rule 23). On August 28, 2002, the appellate court denied respondent's petition for rehearing. On October 7, 2003, the Illinois Supreme Court denied leave to appeal. *Collins v. Boyd*, 205 Ill.2d 578 (2003).

¶ 6 In 2004, respondent filed a motion entitled "motion to correct void sentence." The trial court treated this motion as a motion to reconsider his sentence and concluded that it was untimely. In 2005, respondent filed a second "motion to correct sentence" in which he contended that his 60-year sentence was void because the victim was not 60 years old at the time of the offense. The trial court denied the motion, finding that "the record doesn't show that was the reason for the extended term sentence."

¶ 7 In 2007, respondent filed a second *habeas corpus* complaint raising the same sentencing error. The People moved to dismiss, arguing that the claim was barred by *res judicata*, and was not cognizable in a *habeas corpus* proceeding. Following the trial court's dismissal, on October 27, 2009, this court reversed the judgment. In doing so, we reasoned that respondent's extended sentence was "void" because he had been ineligible for an extended sentence. We recognized that

in *Beacham v. Walker*, 231 Ill.2d 51 (2008), "our supreme court held that a void order or judgment may be challenged at any time, including in a habeas [sic] proceeding." Thus, we found that respondent could pursue such a voidness claim through a *habeas* complaint and vacated his extended term sentence. *People v. Collins*, No. 1-08-0886, order at 7-9 (2009) (unpublished order under Supreme Court Rule 23). Accordingly, we remanded this case to the circuit court to determine the factual question of his definitive release date.

¶ 8        Upon remand, on January 26, 2010, the circuit court determined that respondent's proper release date had been May 19, 1999. The circuit court ordered respondent released on mandatory supervised release (MSR). Respondent subsequently challenged the imposition of the MSR term, but, on appeal, we found that respondent was required to serve an MSR term despite his unlawfully prolonged sentence. *Collins v. Ashby*, 2012 IL App (1st) 110401-U (unpublished order under Supreme Court Rule 23).

¶ 9        On January 25, 2010, shortly before the trial court ordered respondent's release from the Illinois Department of Corrections ("IDOC"), the People filed a petition seeking respondent's commitment under the Illinois Sexually Violent Person's Commitment Act ("SVP Act"). An expert, Dr. Phil Reidda, conducted an evaluation on behalf of the IDOC, and determined that respondent was dangerous because he suffered from mental disorders that rendered him substantially probable to commit future acts of sexual violence. On February 24, 2010, the circuit court found probable cause to believe that respondent was an SVP pursuant to the SVP Act, and ordered that respondent be detained pending trial.

¶ 10        Respondent subsequently filed a motion to dismiss the petition. He argued that the petition violated due process because the State failed to comply with a duty to correct his unlawfully

extended sentence, and it violated equal protection because state officials arbitrarily refused to permit him to serve his MSR upon the termination of his lawful sentence in 1999.

¶ 11     The trial court denied the motion.[1] It rejected respondent's contention that the State violated a duty to correct a void sentence or was to blame for the delay in the correction of his void sentence. The trial court found that the State properly "relied on existing precedent" to seek dismissal "on procedural grounds." Moreover, the "basis for respondent's ultimate relief - - that the victim was actually two months shy of 60 years of age at the time of the commission of the offense - - is objectively a detail of such proportion that any error would not be readily apparent on the record," and thus the onus of correcting this error was "on respondent and his attorneys" following respondent's 1985 conviction.

¶ 12     The trial court also found that "the record does not support [respondent's] claim that any intentional discrimination occurred"; rather, "he was treated as any other prisoner" required by law to serve MSR upon release from prison. Absent the commitment petition, "he would have entered MSR upon the termination of his sentence of incarceration just as any other defendant would have done," and "[h]e was certainly treated the same as any respondent under the Act" civilly committed before serving MSR. In sum, notwithstanding respondent's "unique" circumstances, the SVP proceeding was lawful."

¶ 13     Prior to trial, the State filed a motion seeking the trial court to bar the expert witnesses from testifying regarding the opinions of other, non-testifying experts. During the hearing on the motion, respondent stated that they would seek to introduce the "2000 screening…where another doctor did not refer [respondent] for commitment." The trial court ruled that respondent must call that

---

[1] The Honorable Paul J. Biebel, Jr. presided over the hearing on respondent's motion to dismiss.

doctor as his own witness "but you're not going to get it in through any other witness."[2] However, the trial court reserved ruling on the motion "to see how that gets flushed out at trial." Subsequently, respondent disclosed his intent to call Dr. Schaab as a witness. The State filed a motion specifically seeking to bar the testimony of Dr. Schaab on the grounds that this doctor's opinion "is almost 18 years old, so [it] has no bearing on whether or not Respondent is a Sexual Violent Person at the present time." The State further argued, because Dr. Schaab was no longer a licensed clinical psychologist in Illinois and has never been a licensed sex offender evaluator in Illinois, he would be unable to render a current and relevant opinion. The State also pointed out that the record did not contain any basis to find that Dr. Schaab's opinion was based on respondent not suffering from a mental disorder. In response, respondent argued that "Dr. Schaab in this case is proposed as a fact witness, not as an opinion witness." Respondent further argued that this testimony "gives the jury the complete picture of how [respondent's] case came to be before them…" In barring this testimony, the trial court agreed with the State's argument that Dr. Schaab's opinion regarding whether respondent met the SVP criteria was almost 18 years old and, therefore, was not relevant to a determination as to whether he met the requirements at the time of the hearing.

¶ 14       Respondent moved the trial court to ask prospective jurors multiple questions about their attitudes towards sex offenders, including whether the jurors could be fair and impartial after hearing evidence that respondent had been convicted of sexual offenses involving a 69-year-old woman and a 59-year-old woman; whether the jurors harbored any bias or prejudice against sex offenders; and whether the jurors had any preconceived notions as to a sex offender's likelihood

---

[2] The Honorable Peggy Chiampas presided over the hearing on this motion.

of re-offending.[3] The trial court denied these requests, finding that these questions "too specifically addressed the evidence expected to be adduced at trial." Instead, the trial court asked the jury, "Knowing that [respondent] has already been convicted of a sexually violent offense[,] can you be fair in determining whether or not he is a sexually violent person in this case?"

¶ 15        Respondent's trial commenced on January 28, 2020. At trial, two experts, Dr. John Arroyo and Dr. David Suire, testified for the State. Dr. Arroyo worked as a clinical and forensic psychologist and provided evaluation services for the Sex Offender Evaluation Unit with IDOC. He evaluated respondent in 2011 and, in doing so, he reviewed respondent's IDOC master file, which included police reports and documents from his criminal cases, well as disciplinary records from respondent's time in custody. Before Dr. Arroyo testified to respondent's records, the trial court provided the following limiting instruction:

> I'm allowing the witness to testify in part to materials included but limited to police reports, Department of Corrections records, Department of Human Services records, psychological evaluation, psychological testing, psychological articles and statements other than those made by the defendant to the doctor. None of this material has been admitted into evidence. This testimony is allowed for a limited purpose. It is allowed so that the witness may tell you what he relied on to form his opinion.
>
> The material being referred to is not evidence in this case. It may not be considered by you as evidence. You may consider the materials for the purpose of deciding what weight, if any, you will give the opinions testified to by this witness.

---

[3] The Honorable Michael Clancy presided over the hearing on this motion as well as the trial in this case.

¶ 16      Dr. Arroyo testified that he approached respondent with a request to interview him for evaluation purposes, but respondent declined. At that time, he determined that respondent met the criteria to be civilly committed as a sexually violent person. He updated his evaluation in 2015, and again in 2019, and still found that respondent met the criteria to be civilly committed as a sexually violent person.

¶ 17      In part, he considered respondent's criminal history in forming his opinion because he was trying to determine whether respondent had a sexually-related mental disorder or any other type of mental disorder. He learned that, in a 1967 case, respondent was convicted of burglary and attempt rape of a 69-year-old woman when he was 20 years old. Respondent entered the victim's home and was in the process of ripping off her clothes when police arrived. He was sentenced to 5 to 14 years' imprisonment. Also in 1967, respondent committed a separate attempt burglary in which he "forcibly attempted to gain entry into a convent…" He was sentenced to 1 to 3 years' imprisonment for that offense.

¶ 18      In 1974, while on parole, respondent was arrested for rape, attempt rape, robbery, and burglary. In two separate cases, respondent, wearing a ski mask, burglarized the home of the 78 and 80-year-old victims and when he attacked them.  A few days later, while armed with a straight razor, respondent entered the home of these two victims for a second time. Respondent was sentenced to 6 to 18 years' imprisonment for burglary and two to six years' imprisonment for robbery. See *People v. Collins*, 53 Ill.App.3d 114 (1977).

¶ 19      In 1979, while on parole for these offenses, respondent was arrested for burglary after someone observed him peering into the window of a woman's home, flee to another home of another woman where he entered that home through a window. When the police arrived at the scene, he was seen

exiting the home through a window and, during the ensuing chase, dropped a butcher knife, mask and socks. See *People v. Collins*, 97 Ill.App.3d 465 (1981).

¶ 20    In 1984, while on parole, he was arrested for rape, home invasion, attempt murder, among other charges. He entered the home of a 59-year-old female who had just exited the shower, threw a blanket over her head, choked her, forced her into a bedroom where he raped her. He was wearing a stocking mask on his head and stocking on his hands. He was sentenced to concurrent sentences of 30 years' imprisonment for rape, 30 years' imprisonment for home invasion, and 5 years' imprisonment for aggravated battery. See *People v. Collins*, 176 Ill.App.3d 169 (1st Dist. 1988).

¶ 21    In a separate 1984 case, he was charged with attempt rape, unlawful restraint, aggravated kidnapping, robbery, and residential burglary. He entered the home of a 74-year-old woman, threw a blanket over her head, forced her to undress, fondled her, and stole cash from her. This incident occurred two to three days after the other 1984 offense. The State dismissed charges in this case after respondent was convicted in the other 1984 case. Dr. Arroyo explained that he still considered cases in which respondent was charged, but not convicted of various offenses, because he looked to determine whether there were any similarities between behaviors to indicate that there may be a mental disorder leading toward this behavior.

¶ 22    In his evaluation, Dr. Arroyo also considered respondent's conduct while in a controlled environment because it showed that respondent was still willing to risk getting into trouble to attain sexual satisfaction. While incarcerated in IDOC, respondent received two disciplinary tickets for sexual misconduct. Both incidents involved consensual encounters with older women. While housed in the detention facility awaiting trial, respondent was caught in possession of "hard-core pornographic material."

¶ 23     Using the DSM-5, Dr. Arroyo diagnosed respondent with "other specified paraphilic disorder sexually aroused by non-consenting partners" along with "other specified personality disorder with anti-social features." He also conducted a risk assessment and determined that respondent was substantially probable to reoffend, meaning more likely than not. He used actuarial instruments that placed respondent in the above-average risk category for being convicted of committing another sexual offense.

¶ 24     On cross-examination, respondent's counsel asked Dr. Arroyo, "If you were to flip a coin, would you say that it's much more likely than not to land on heads?" The trial court sustained the State's objection. Respondent's counsel also attempted to cross-examine Dr. Arroyo regarding appellate court decisions related to respondent's 1974 burglary conviction and his 1979 burglary conviction. Dr. Arroyo explained that he did not rely on these decisions in rendering his opinion and first reviewed them only three days before he testified. The trial court barred counsel from asking questions to introduce the content of these appellate decisions. Relying upon inadmissible hearsay grounds, the trial court stated, "If he relies on it, he can testify to it, even if it's hearsay," but "[i]f he doesn't rely on it, he can't testify to hearsay" and "it's not coming in."

¶ 25     Dr. Suire evaluated respondent on behalf of the Illinois Department of Human Services ("IDHS") in 2012, after respondent had been referred for possible commitment. Before Dr. Suire outlined the documents that he relied upon in his evaluation, the trial court provided the same limiting instruction as it did with Dr. Arroyo's testimony. Dr. Suire also relied on respondent's criminal history. He explained that he considered both convictions and arrests where "if someone commits a crime that looks to be motivated by sexual issues or sexual arousal, it's important to consider that, even if the ultimate charge or conviction is not sexual in nature."

¶ 26    Dr. Suire also diagnosed respondent as suffering from both other specified paraphilic disorder towards non-consenting victims and other specified personality disorder with antisocial features. He noted that on at least five occasions, respondent "broke into the home of women that were considerably older than him" and "used force to either attain sexual contact or to attempt to gain sexual contact." Furthermore, he committed "a large number of sexual offenses" over "a number of years" even though "he wasn't in the community that often" due to his repeated incarcerations.

¶ 27    He concluded that respondent was substantially probable to reoffend, meaning much more likely than not. He used two actuarial instruments, the Static-99R and the Static-200R, which placed respondent in the above average range for risk to reoffend even after giving him "an extremely substantial reduction" based on his age. Dr. Suire identified several risk factors that were empirically linked to recidivism but not captured by the actuarial instruments, including respondent's deviant sexual interest, demonstrated hostility toward women, inability to learn from punishment, impulsivity, and personality disorder. Respondent had not been eligible to participate in a treatment program to reduce his risk because "he denied committing any offenses," and "its [sic] hard to come up with a relapse prevention plan if you are not acknowledging that you committed any acts." Dr. Suire did not view respondent's age or health condition as further protective factors because he was "in pretty good shape," and was "very active at the facility," where he "participates in circuit training[,]…plays basketball[,]…[and] was bench pressing a couple of hundred pounds."

¶ 28    On cross-examination, respondent asked Dr. Suire "Now, you told us that it's significant to your opinion that [respondent] scores above average on the Static-99R, right, the Static-2002R" After Dr. Suire responded affirmatively, the State objected when respondent asked him, "Isn't it true that you recommended someone for commitment even though they had a score of 1?" The

trial court sustained the objection, holding that it was improper "to take an evaluation of one person, look at one aspect of that evaluation and see what the opinion is," and that it "would go[] too far afield" to ask him about "all hundred of his evaluations…to see how he's come up with them as sexually violent persons."

¶ 29     Respondent presented the testimony of Dr. Leslie Kane, a clinical psychologist and licensed sex offender evaluator in Illinois. As the trial court did before the other experts outlined the documents that they relied upon in his evaluation, the trial court provided a limiting instruction to the jury that they may not consider it as substantive evidence. Dr. Kane determined that respondent was not an SVP. The doctor determined that respondent was suffering from other-specified personality disorder with antisocial features but did not diagnose him with a paraphilic disorder. Dr. Kane explained that respondent's sexual offenses, "even though they were nonconsensual acts," were attributable to "antisocial behavior, the criminal mindset, taking what you want, when you want." She testified that the assaults were "more of an opportunist situation where he would go with an intention of robbing or burglarizing and then took advantage of the situation when there is a single, vulnerable woman in the house." Dr. Kane further testified that respondent was not substantially probable to reoffend given respondent's age. The doctor noted, however, that people with "true paraphilia…tend to not let go of that behavior."

¶ 30     On cross-examination, Dr. Kane conceded that all of respondent's offenses involved breaking into a home where an older woman was home, and that he had not broken into businesses or unoccupied homes. During those break-ins, he stole no valuable property, such as jewelry or electronics. The doctor also conceded that respondent, though older, was "a relatively healthy guy" and was "playing basketball and doing circuit training, [and] that he jogs at the facility."

¶ 31     The jury found that respondent was an SVP. On August 20, 2020, after the trial court denied respondent's motion for a new trial, it found that respondent should be committed for treatment at a secure facility. Soon thereafter, respondent's health deteriorated, and respondent petitioned for discharge. Two experts who examined respondent opined that respondent was no longer substantially probable to reoffend and a hearing proceeding based on their stipulated testimony. On April 19, 2021, the trial court found that the State had not met its burden of demonstrating that respondent remained an SVP and ordered that he be discharged from commitment.

¶ 32                                    **ANALYSIS**

¶ 33     The Sexually Violent Persons Commitment Act authorizes the involuntary civil commitment of "sexually violent persons" for "control, care and treatment until such time as the person is no longer a sexually violent person." 725 ILCS 207/40(a) (West 2016). The Act defines a "sexually violent person" as an individual who has "been convicted of a sexually violent offense" and who "is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence." 725 ILCS 207/5(f) (West 2016). A "mental disorder" is defined under the Act as a "congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." 725 ILCS 207/5(b) (West 2016). If the State proves beyond a reasonable doubt that an individual is a sexually violent person, that individual may be indefinitely committed "until such times as the person is *no longer* a sexually violent person." (Emphasis added.) 725 ILCS 207/35(f), 40(a) (West 2016).

¶ 34     After an individual has been committed to institutional care under the Act, the Department is responsible for evaluating the individual's mental condition within six months of the initial commitment and again thereafter at least annually. 725 ILCS 207/55 (West 2016). The stated purpose of these periodic examinations is to determine "whether the person has made *sufficient*

*progress* to be conditionally released or discharged." (Emphasis added) 725 ILCS 207/55 (West 2016); *People v. Botruff*, 212 Ill.2d 166, 171 (2004) (purpose of reexamination is to determine whether person has "progressed enough to be conditionally released or discharged").

¶ 35                                                    **I. Mootness**

¶ 36      As a threshold issue, we address the question of whether respondent's appeal is moot where he was subsequently discharged from civil commitment as an SVP while his appeal is pending. Respondent contends that this appeal is not moot because he has an interest in purging himself of the stigma attached to the finding that he is an SVP. He further contends that, even if the appeal is moot, we may reach the merits of his claim under the collateral consequences exception to the mootness doctrine. He contends that this exception is applicable because he is still required to register as a sex offender, pursuant to the Illinois Sex Offender Registration Act ("the Act") (730 ILCS 150/1 *et seq*. (West 2012), every 90 days for the rest of his life as a result of him being found to be a SVP. The State agrees that, under the collateral consequences doctrine, we may review respondent's appeal because vacating the judgment will relieve him of the obligation to register every 90 days for the rest of his life.

¶ 37      Appellate jurisdiction requires an actual controversy, and courts of review generally will not hear abstract, hypothetical, or moot issues. *In re Andrea F.*, 208 Ill.2d 148, 156 (2003). An appeal is moot "if no actual controversy exists" (*Dixon v. Chicago and North Western Transportation Co.*, 151 Ill.2d 108, 116 (1992)), or "when intervening events have rendered it impossible for the reviewing court to grant effectual relief to the complaining party." *In re Commitment of Hernandez*, 239 Ill.2d 195, 201 (2010) (citing *Felzak v. Hruby*, 226 Ill.2d 382, 392 (2007)). Whether a claim is moot is an issue we review *de novo* on appeal. *Benz v. Department of Children and Family Services*, 2015 IL App (1st) 130414, ¶ 31.

¶ 38      Here, respondent asks for this court to reverse the trial court's judgment adjudicating him an SVP and therefore committing him to treatment under the Act. However, the parties agree that respondent was subsequently released from his commitment as an SVP after there were changes to respondent's health. Therefore, it is impossible for this court to grant the relief respondent requests, and we find the appeal is moot. See *In re Benny M.*, 2017 IL 120133, ¶ 19 (appeal was moot because the respondent's 90 days of court-ordered medical treatment ended before appellate review); *In re Lance H.*, 2014 IL 114899, ¶ 12 (appeal was moot because the court order to commit respondent to a medical center had expired nearly three years prior); *In re Alfred H.H.*, 233 Ill.2d 345, 350-51 (2009) (appeal was moot because 90-day commitment order had terminated). Respondent relies upon criminal cases in which courts found that an appeal is not mooted by the end of State-supervised detention due to a defendant's interest in avoiding the stigma and disabilities attending a criminal conviction. See *People v. Coe*, 2018 IL App (4th) 170359, 50; *People v. Davis*, 39 Ill.2d 325, 329 (1968). As the State points out, however, an SVP proceeding is civil, not criminal. 725 ILCS 207/20 (West 1998).

¶ 39      Nevertheless, both parties agree that we may address respondent's appeal under the "collateral consequences exception" to the mootness doctrine. The collateral consequences exception to mootness "allows for appellate review, even though***incarceration has ceased, because a plaintiff has suffered, or is threatened with, an actual inquiry traceable to the defendant and likely to be redressed by a favorable judicial decision." (Internal quotation marks omitted.) *In re Alfred H.H.*, 233 Ill.2d 345, 361 (2009) (quoting *Spencer v. Kemna*, 523 U.S. 1, 7 (1998)). The determination of whether this exception is applicable is "decided on a case-by-case basis." *Alfred H.H.*, 233 Ill.2d at 362.

¶ 40 Both parties agree that the judgment designating him as an SVP, even after he was discharged from commitment, will require him to register as a sex offender every 90 days and to register for the rest of his life. Pursuant to Section 150/6 of the Illinois Sex Offender Registration Act, anyone "adjudicated to be a…sexually violent person and is later released, or found to be no longer….a sexually violent person and discharged,…shall report in person to the law enforcement agency with whom he or she last registered no later than 90 days after the date of his or her last registration and every 90 days thereafter…" 730 ILCS 150/6 (West 2012). Moreover, an SVP "shall register for the period of his or her natural life." 730 ILCS 150/7 (West 2012). Respondent would not otherwise have to register as a sex offender for the rest of his natural life.

¶ 41 Therefore, because vacating respondent's judgment would relieve him of the obligations to register as a sex offender every 90 days and for the rest of his natural life, we find that respondent has successfully established that review of this case falls under the collateral consequences exception to the mootness doctrine. Consequently, we find that review of respondent's appeal is proper.

¶ 42 **II. Motion to Dismiss Petition**

¶ 43 Respondent challenges the trial court's decision to deny his motion to dismiss the SVP petition on the basis that it violated his constitutional rights to due process and to equal protection. Regarding due process, he contends that the filing of the SVP petition violated his due process rights where the State failed to correct the erroneous extended-term sentence imposed by the trial court in respondent's underlying criminal case. According to respondent, had the State corrected his sentence at an earlier point in time, respondent would have not been subject to a commitment proceeding under the Act.

¶ 44    The State asks us to uphold the trial court's decision that respondent's due process rights were not violated where the State relied upon existing precedent in opposing his challenges to his sentence. Specifically, the trial court found that respondent's claim, raised in the context of *habeas corpus* proceedings, "were not properly before the Court until the Illinois Supreme Court decision in *Beacham v. Walker*, 231 Ill.2d 198 (2008), which permitted a respondent to challenge a void sentence in a habeas petition." Moreover, the trial court found that the State followed the proper procedures when it filed its petition, and "[i]t is simply impossible to find that respondent may or may not have been subject to commitment proceedings if any of his prior challenges to his sentence had been successful or if the Attorney General had corrected the void sentence at an earlier time."

¶ 45    Respondent presented this claim in a pre-trial motion to dismiss. A motion to dismiss challenges the legal sufficiency of a complaint. *Beacham v. Walker*, 231 Ill.2d 51, 57 (2008). This court reviews *de novo* a circuit court decision on a motion to dismiss. *Beacham*, 231 Ill.2d at 57. All well-pleaded facts and reasonable inferences from those facts are accepted as true and are viewed in the light most favorable to the plaintiff. *Id*. at 58.

¶ 46    An individual can access the court system and seek collateral relief following a direct appeal of a trial court's judgment through four vehicles: a postconviction petition, a *mandamus* complaint, a *habeas corpus* complaint, and a section 2-1401 petition. *In re Commitment of Phillips*, 367 Ill.App.3d 1036, 1041 (5th Dist. 2006). Here, respondent sought collateral relief, following his direct appeal challenge, utilizing a *habeas corpus* complaint in 2001 and again in 2007. At both the trial level and on appeal, the courts held that respondent improperly raised his claim of a sentencing error in a *habeas corpus* complaint. At that time, it was well-established that a *habeas corpus* complaint was not the proper vehicle for challenging an unlawful extended sentence. See *Barney v. Prisoner Review Board*, 184 Ill.2d 428, 430-31 (1998) ("*habeas corpus* is available only

to obtain the release of a prisoner who has been incarcerated under a judgment of a court which lacked jurisdiction…or where there has been some occurrence subsequent to the prisoner's conviction which entitled him to release" and cannot be guaranteed 'unless the time during which such party may be legally detained has expired.")

¶ 47     In 2008, however, the supreme court issued its decision in *Beacham* in which it held that the claim that a sentence is void may be raised at any time, including in a *habeas* petition. *Beacham*, 231 Ill.2d at 59. When we ruled, in 2009, in light of *Beacham*, that respondent could properly raise his claim that his sentence was void in a *habeas corpus* complaint, we recognized that when the Fourth District ruled on respondent's initial complaint, it was done so prior to the Illinois Supreme Court's decision in *Beacham v. Walker*, 231 Ill.2d 51 (2008). *People v. Collins*, No. 1-08-0886, order at 7-9 (2009) (unpublished order under Supreme Court Rule 23).

¶ 48      Respondent recognizes that, prior to *Beacham*, he had not raised this claim in the proper manner. With this concession, we agree with the trial court's determination that respondent's due process rights were not violated when the State followed the applicable law at the time that respondent filed his *habeas* petitions.

¶ 49     Respondent, however, further suggests that his due process rights were violated because the State "had a duty to ensure that prisoner's sentences are lawful." For support, he cites to *U.S. ex rel. Walker v. O'Leary*, 973 F.2d 521 (7th Cir. 1992). In that case, the Seventh Circuit affirmed a grant of federal *habeas* relief to a state prisoner who was entitled to a possible reduction of his sentence under a statutory amendment. The Seventh Circuit rejected the State's argument that state officials could "only…await a court order to adjust a prisoner's sentence to conform to new law," and held that "due process requires the attorney general to take a less passive approach to the resentencing mandate." *Walker*, 973 F.2d at 525.

¶ 50    In response, the State argues that *Walker* does not control where there was no new statute that required the State to recalculate respondent's sentence and that "[t]he People were not required to anticipate [*Beacham*], waive a valid procedural defense, or seek a change in procedural law on respondent's behalf." We agree. As respondent concedes, unlike in *Walker*, there was no new statute that required the State to recalculate his sentence. Here, there was an error in calculating the proper sentence for respondent at the time of trial. *Walker* does not stand for the proposition that there is a violation of due process every time a defendant's sentence is miscalculated and the State has "notice" of the miscalculation. We do not read *Walker* so broadly.

¶ 51    Moreover, we agree with the trial court's finding that the record does not allow for a determination as to whether or not respondent would have been subject to civil commitment at the time that he would have been released in 2000. Respondent relies upon a report, completed by Dr. Anthony Schaab on November 30, 2000, in which he checked a box indicating that civil commitment was not recommended. Considering the scant evidence available, not only does respondent not provide this court with any authority allowing for it to make a retroactive determination as to whether respondent would have been subject to civil commitment at the time that he would have been released in 2000, but it would be impossible for this court to make such a determination where Dr. Schaab's report does not provide an explanation for why he found that civil commitment was not recommended. Therefore, we find that respondent has not established a due process violation.

¶ 52    Respondent further asks for this court to review his contention that his constitutional right to equal protection was violated where "the petition was obtained as the result of intentional discrimination against [respondent] that lacked any rational basis." He contends that the State intentionally discriminated against him by preventing him from entering MSR, as other inmates

who complete their terms of incarceration are permitted to do, and that he is now subject to indefinite civil commitment. He contends that the State prevented him from entering MSR because it did not rectify his incorrect sentence when first given notice of it.

¶ 53     The United States Constitution and Illinois Constitution guarantee that no person shall be denied equal protection of the laws. U.S. Const. amend. XIV; Ill. Const. 1970, art. I, sec. 2. The right to equal protection of the laws requires the government to treat similarly situated persons in a similar manner. *In re Detention of Samuelson*, 189 Ill.2d 548, 561 (2000). Although the equal protection clause does not preclude the State from enacting legislation that draws distinctions between different categories of people, it does prohibit the government from according different treatment to persons who have been placed by a statute into different categories on the basis of criteria wholly unrelated to the purpose of the legislation. *People v. Fisher*, 184 Ill.2d 441, 450 (1998). If a statutory classification neither impinges on a fundamental right nor is based on a "suspect" class, a court will use the "rational basis" test to review the statute's validity. *People v. Runge*, 346 Ill.Ap.3d 500, 508 (3d Dist. 2004). In considering prior equal protection challenges to the Act, the supreme court has applied the rational basis test. *Samuelson*, 189 Ill.2d at 562. Under that test, the court simply inquires whether the stated goal or purpose of the legislation is rationally related to that goal. *Id.* at 562. Consequently, if any set of facts can reasonably be conceived to justify the classification, it must be upheld. *In re A.A.*, 181 Ill.2d 32, 38 (1998).

¶ 54     There is no support for respondent's claim that the State intentionally discriminated against him. Instead, we find that he was treated as any other prisoner would have been treated. In *Collins v. Ashby*, 2012 IL App (1st) 110401-U (unpublished order pursuant to Illinois Supreme Court Rule 23), we reviewed and upheld the trial court's determination that his release date was May 19, 1999, and that upon his release, a three-year term of mandatory supervised release (MSR) remained to

be served. In doing so, we rejected respondent's contention that he had already served his MSR term while incarcerated, and there was no longer a period of MSR to serve when he was released from prison in January of 2010. In part, we found that "[respondent] in this case cannot substitute his excess prison time for his MSR term." *Collins*, 2012 IL App (1st) 110401-U, ¶ 7. The Court ordered that respondent begin serving his MSR upon his release from prison, as the law required. *Id.* ¶ 8. He was treated the same as any other prisoner based upon the applicable law. Consequently, we find that the trial court properly denied respondent's motion to dismiss his SVP petition on equal protection grounds.

¶ 55                                **III.** *Voir Dire* **Questions**

¶ 56     Respondent next contends that the trial court erred in failing to ask the prospective jurors during *voir dire* about whether they had any bias or prejudice against him knowing that he had been convicted of sexual offenses involving a 69-year-old woman and a 59-year-old woman; whether they harbored any bias against sex offenders, and whether they had any preconceived notions about a sex offenders' risk to reoffend.

¶ 57     Illinois Supreme Court Rule 234 provides that a trial court "shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching upon their qualifications to serve as jurors in the case on trial." Ill. S. Ct. R. 234 (eff. May 1, 1997). "Moreover, "[t]he court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, and shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time depending upon the length of examination by the court, [and] the complexity of the case." Ill. S. Ct. R. 234 (eff. May 1, 1997).

¶ 58    "One of the purposes of *voir dire* is to filter out those potential jurors who are either unable or unwilling to be fair and impartial." *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 44. However, the purpose of *voir dire* "is not to be used to indoctrinate jurors or to impanel a jury with a particular predisposition" or "ascertain prospective jurors' opinions with respect to evidence to be presented at trial." (internal quotation marks omitted.) The manner, extent, and scope of *voir dire* examination rests within the discretion of the trial court. *People v. Encalado*, 2018 IL 122059, ¶ 25. "'So long as the procedures employed by the circuit court provided a reasonable insurance that prejudice, if any, would be discovered, the court's exercise of discretion would be upheld.'" *In re Commitment of Brown*, 2021 IL App (1st) 191606, ¶ 70 (quoting *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 41. On review, an abuse of discretion will be found only when the record reveals that the court's conduct "'thwarted the selection of an impartial jury.'" *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 15 (quoting *People v. Terrell*, 185 Il.2d 467, 484 (1998). "'To be constitutionally compelled, it is not enough that a *voir dire* question be helpful[;] rather, the trial court's failure to ask the question must render the defendant's proceedings fundamentally unfair.'" *Encalado*, 2018 IL 122059, ¶ 25 (quoting *People v. Terrell*, 185 Ill.2d 467, 485 (1998)).

¶ 59    The Illinois courts have previously considered arguments in which the respondent had sought to question the prospective jurors regarding specific aspects related to their criminal history involving sexual offenses. In each of these cases, we have found that the trial court did not abuse its discretion in denying this request. *Butler*, 2013 IL App (1st) 113606; *In re Commitment of Gavin*, 2014 IL App (1st) 122918; *Brown*, 2021 IL App (1st) 191606. For instance, in *Butler*, we upheld the trial court's decision to not permit the respondent from questioning the prospective jurors if they could be fair and impartial given that the respondent had been convicted of three

sexually violent offenses, and instead, removed the number three from this question. *Butler*, 2013 IL App (1st) 113606, ¶ 23. Notably, we found, when distinguishing the respondent's case, "[t]hese cases do not hold that when the subject matter is controversial, jurors must be questioned with regard to all of the details of the subject that are expected to be admitted into evidence." *Id*.

¶ 60    In *Gavin*, the respondent sought to question the prospective jurors regarding their ability to be fair and impartial upon learning that the respondent had been convicted of criminal sexual assault, attempted rape, rape and indecent liberties with a child. Instead, the trial court allowed the jury to be questioned whether they could be fair and impartial knowing that the respondent was convicted of sexually violent offenses four times. Relying upon *Butler*, we found that the trial court did not abuse its discretion when limiting counsel's inquiry to bias arising from convictions for sexually violent offenses. *Gavin*, 2014 IL 122918, ¶ 43 (citing *Butler*, 2013 IL App (1st) 113606, ¶ 24). We recognized that "it is not the purpose of *voir dire* to preview the evidence for the jury, or to measure the jurors' reactions to certain facts." *Id*. at ¶ 44.

¶ 61    More recently, in *Brown*, we upheld the trial court's decision to not permit inquiry as to whether prospective jurors could be fair and impartial knowing that the respondent committed a sex offense against a child. Relying upon *Butler* and *Gavin*, we found that "the general inquiry" about the respondent prior criminal convictions provided the appropriate "balance between informing the prospective jurors of the respondent's history while avoiding disclosing too much information." *Brown*, 2021 IL App (1st) 191606, ¶ 76; See also *In re Commitment of Edwards*, 2021 IL App (1st) 200192, ¶ 53 (the trial court properly exercised its discretion in restricting questions to the prospective jurors regarding their ability to remain fair and impartial knowing that the respondent had been convicted of a sexually violent offense against a child).

¶ 62    Moreover, when looking at whether the trial court exercised appropriate discretion, we also look to the questions that the trial court asked the prospective jurors. Instead of specifically asking the jurors about any bias or prejudice relating to certain aspects of respondent's criminal history, the trial court, instead, decided to provide more generalized questioning to the prospective jurors. During *voir dire*, the trial court informed the prospective jurors that respondent was charged with being a sexually violent person and asked the venire whether there was anything about the nature of the charges that would prevent them from giving both sides a fair and impartial trial. See *Encalado*, 2018 IL 122059, ¶ 34 (the Supreme Court considered that the prospective jurors were informed of the charges involving sexual penetration and were asked if there was anything about the nature of the charges to prevent them from being fair and impartial). None of the prospective jurors raised their hands. The trial court also individually inquired from each of the prospective jurors whether they or any of their immediate family members or a very close friend had been a victim of a crime, whether they or anyone close to them had been the victim of sexual abuse or sexual assault, and whether they or any family member were part of an organization that represents or advocates on behalf of crime victims, sexual assault victims, or victims of domestic violence. At least twelve different prospective jurors disclosed that they, a close family member, or a close friend had been sexually assaulted or abused. One of the prospective jurors disclosed that she worked as a "rape crisis counselor[.]" As a result, respondent used his peremptory challenges to strike jurors and the trial court granted respondent's request to strike another juror for cause after this person also indicated that they could not be fair and impartial. Consequently, the trial court's method of questioning provided respondent the opportunity to learn about whether the prospective jurors could remain fair and impartial regarding the prospective jurors' experiences and opinions regarding sexual assault and sexual abuse. See *Edwards*, 2021 IL App (1st) 200192, ¶ 55 ("Under

these circumstances, the trial court's questioning of the venire created a reasonable assurance that any prejudice would have been discovered.")

¶ 63    Also, in *Brown*, we considered that the respondent's sex offenses "were not admitted as substantive evidence but were detailed to explain the opinions of the expert witnesses." *Brown*, 2021 IL App (1st) 191606, ¶ 78. Likewise, here, the trial court provided a limiting instruction to the jury regarding of the doctors' testimonies regarding respondent's criminal history.

¶ 64    In support, respondent asks this court to look to *People v. Strain*, 194 Ill.2d 467 (2000), case in which the Supreme Court ruled that the trial court abused its discretion when it failed to question the jurors regarding any prejudice or bias involving gang members, and to expand its holding to include questioning jurors regarding the age of the sexual assault victims. As this court has recently recognized in *Brown*, 2021 IL App (1st) 191606, ¶ 77, "…Illinois courts have not extended *Strain* to any other specific areas of controversial inquiry." *People v. Encalado*, 2018 IL 122059, ¶¶ 28-33 (prostitution); *People v. James*, 2017 IL App (1st) 143036, ¶ 40 (firearms); *People v. Anderson*, 407 Ill.App.3d 662, 682 (1st Dist. 2011); *People v. Dixon*, 382 Ill.App.3d 233, 245 (1st Dist. 2008) (drug abuse). We decline to do so under the circumstances in this case, especially where the trial court explored whether the prospective jurors had any bias or prejudice relating to respondent's criminal history but did so in a more generalized manner of questioning. This type of *voir dire* questioning stands in sharp contrast to *Strain* where the prospective jurors were not questioned at all regarding any potential bias or prejudice related to gang membership. *Strain*, 194 Ill.2d at 475-478.

¶ 65    As to respondent's request to ask the prospective jurors regarding any preconceived notions about a sex offender's risk to reoffend, we find that the trial court's other questions properly addressed any concerns regarding the prospective jurors' bias or prejudice. The trial court

informed the prospective jurors that they must follow the law as provided, that they must be able to set aside their own personal disagreement with the law and apply the law as instructed, that respondent is presumed not to be a sexually violent person, and that the State has the burden to prove that he is a sexually violent person beyond a reasonable doubt. These questions served the purpose of *voir dire* which is to ascertain sufficient information about jurors' beliefs and opinions as to allow removal of those members whose minds are so closed by bias and prejudice that they cannot apply the law as instructed. *People v. Cloutier*, 152 Ill.2d 483, 495-96 (1993).

¶ 66    Thus, we conclude that trial court's questioning of the prospective jurors created a reasonable assurance that any prejudice would have been discovered. Accordingly, we cannot find that the trial court's failure to allow respondent additional questions specifically concerning sex offenders, sexually violent offenses against an older person or whether they had any preconceived notions about a sex offender's risk to reoffend, thwarted the selection of an impartial jury.

¶ 67                         **IV. Evidentiary Rulings**

¶ 68              **A. Barred testimony regarding previous evaluation**

¶ 69    Respondent contends that the trial court abused its discretion in barring him from introducing the testimony of Dr. Anthony Schaab regarding an SVP screening he conducted in 2000, finding that he would not recommend respondent for civil commitment. According to respondent, this testimony would have rebutted the testimony of the State's witnesses, that sexually offending behaviors do not typically change or go away, and because the testimony "was not being offered to show [respondent's] current status… [but] to highlight how little had changed with [his] condition since 2000." Upon review, we find that the trial court did not abuse its discretion by barring Dr. Schaab's testimony.

¶ 70     Under the Act, respondent has a right to cross-examine witnesses at the jury trial. 725 ILCS 207/25(c)(3) (West 2012). However, "the right to present a defense does not include the right to introduce irrelevant evidence." *In re Detention of Melcher*, 2013 IL App (1st) 123085, ¶ 44 (citing *People v. Lowitzki*, 285 Ill.App.3d 770, 779 (1st Dist. 1996).

¶ 71     While respondent contends that Dr. Schaab's testimony would have been significant to show that the State's expert witness had no basis of opinion to explain what had changed since 2000 to conclude that he was a sexually violent person, that was not an issue at respondent's trial. Here, "the issue in an SVP proceeding is whether respondent suffers from a mental illness that makes it substantially probable he will engage in future acts of sexual violence." *Melcher*, 2013 IL App (1st) 123085, ¶ 45 (citing 725 ILCS 207/5(f) (West 2012)). Thus, the issue at trial was respondent's current mental state, not respondent's mental state 18 years ago. We recognize that, to support his defense that he did not currently suffer from a mental illness, respondent presented the testimony of Dr. Kane, who testified that, in her opinion, respondent did not qualify as an SVP based upon his *current* mental state. Moreover, respondent was permitted to introduce testimony, during cross-examination, that after respondent was sentenced to the Illinois Department of Corrections, "there were no records of anyone at that time diagnosing [him] with a paraphilia or a paraphilic disorder…" Later during cross-examination, Dr. Schaab again testified that respondent had not previously been diagnosed with paraphilia or paraphilic disorder. Consequently, respondent introduced evidence of the absence of any prior mental diagnoses of paraphilia or paraphilic disorder during cross-examination of the State's expert witness testimony despite the restriction in presenting this testimony through Dr. Schaab. Consequently, we find that the trial court did not abuse its discretion in barring the testimony of Dr. Schaab as to his evaluation of respondent 18 years ago.

¶ 72                                    **B. Scope of Cross-Examination**

¶ 73        Respondent also contends that the trial court erred in three rulings that it made relating to the scope of cross-examination of the expert testimony presented by the State. Respondent sought to question the expert witnesses regarding: (1) two appellate court opinions that the experts reviewed but did not rely upon in rendering their expert opinions; (2) whether their finding "substantial probability" equated to a coin flip; and (3) whether Dr. Suire had previously recommended an individual for commitment when that person received a particular score on one of the actuarial instruments. We find that the trial court did not abuse its discretion in restricting cross-examination in these three areas.

¶ 74        It is well-established that the scope of cross-examination is within the sound discretion of the trial court and will not be overturned absent an abuse of discretion. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). The trial court has broad discretion to limit cross-examination to preclude prejudice, witness harassment, repetitive and irrelevant questioning (*People v. Tabb*, 374 Ill.App.3d 680, 689 (1st Dist. 2007)), or to exclude evidence of bias that is too remote or uncertain (*People v. Prevo*, 302 Ill.App.3d 1038, 1048 (4th Dist. 1999)). Unless the defendant can show his or her proposed line of questioning was not based on a remote theory and that the limitation resulted in manifest prejudice to him, "a court's ruling limiting the scope of examination will be affirmed." *Tabb*, 374 Ill.App.3d at 689. An abuse of discretion will only be found if the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. McDonald*, 2016 IL 118882, ¶ 82.

¶ 75        Initially, we consider the trial court's decision relating to questioning the State experts as to their reliance upon prior appellate court opinions. As far as respondent's criminal history, there are three appellate court opinions related to respondent's prior conviction for committing a

burglary in 1974 (See *People v. Collins*, 53 Ill.App.3d 114 (1977)); for committing a burglary in 1979 (See *People v. Collins*, 97 Ill.App.3d 465 (1981); and for committing a rape in 1984 (See *People v. Collins*, 176 Ill.App.3d 169 (1st Dist.1988)). On cross-examination, Dr. Arroyo testified that, in forming his opinion, he reviewed and relied upon the appellate court decision in respondent's 1984 case, and that this type of document is reasonably relied upon by experts in his field. He further testified that he received the appellate court decision from respondent's July 9, 1974, burglary case "three or four days ago." At that point, the State objected based on foundation because there was no testimony that Dr. Arroyo relied upon this opinion. During a sidebar conference, the trial court stated that respondent must first establish whether Dr. Arroyo relied upon these documents, and the doctor could testify to documents that he reasonably relied upon, but he could not testify to documents that he did not reasonably rely upon "because it's hearsay." During further questioning, Dr. Arroyo testified that he reviewed the 1974 appellate court decision from the July 9, 1974, burglary conviction and the 1981 opinion from the 1979 burglary conviction, but he did not rely upon either of these opinions because he received it after he had already submitted his report containing his opinion "[a]nd there was no additional information to where it was relevant to my opinion."

¶ 76    Subsequently, respondent moved for the trial court to reconsider its decision. The trial court upheld its earlier decision and stated, "It's inadmissible hearsay if - - If he relies on it, he can testify to it, even if its hearsay. If he doesn't rely on it, he can't testify to hearsay, it's not coming in."

¶ 77    Then, during cross-examination, Dr. Suire testified that "[t]here may have been some appellate court rulings…" that he reviewed and "there were a couple of new ones that I received last week that I reviewed." He testified that he did not rely upon "the two most recent ones." He explained that he did not rely upon them because he had already written his report and he "didn't see anything

in them that would have changed his opinion." He testified that the opinions contained "some information" about the facts "but it did not appear to be fully summary."

¶ 78     "It is well-settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is the type reasonably relied on by experts in the particular field." *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, ¶ 43 (citing *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51. In addition, "the expert is permitted to reveal the contents of materials upon which he has reasonably relied in order to explain the basis of his opinion." *Tenorio*, 2020 IL App (1st) 182608, ¶ 43 (citing *In re Commitment of Butler*, 2013 IL App (1st) 113606, ¶ 31. Moreover, as respondent points out, "experts may be cross-examined for the purpose of discrediting their testimony, as well as to ascertain which factors were taken into account and which were disregarded in arriving in these conclusions." *People v. Wagener*, 196 Ill.2d 269, 274 (2001).

¶ 79     Here, the trial court permitted respondent to cross-examine both experts as to whether or not they reviewed and relied upon the three appellate court opinions. As to the two appellate court opinions that both experts reviewed after they had already rendered their separate opinions, the trial court also permitted respondent to ask whether both experts relied upon this evidence. Both witnesses stated that they did not rely upon them, explained why they did not rely upon them, and definitively stated that this additional information did not change their opinions. Certainly, these questions provided respondent the opportunity to explore this area of cross-examination and does not provide grounds for this court to find that the trial court abused its discretion.

¶ 80     Next, respondent also argues that the trial court erred because it sustained the State's objection to respondent asking Dr. Arroyo, "If you were to flip a coin, would you say that's much more likely than not to land on heads?" We note that the trial court previously granted the State's motion

*in limine* to bar respondent from attempting to reduce the standard of "substantial probability" to a percentage. We find that the trial court did not abuse its discretion in precluding this question.

¶ 81     We have previously rejected the use of percentages, mathematical formulas, or statistical analysis in defining the phrase "substantial probability" in the Act. See *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶¶ 47-48 (rejecting the respondent's argument to modify the definition of "substantially probable" to "much more than 50%"); *In re Detention of Hayes*, 321 Ill.App.3d 178, 187-88 (2d Dist. 2001) (the definition of "substantially probable" cannot be reduced to a mere mathematical formula or statistical analysis); *In re Detention of Walker*, 314 Ill.App.3d 282, 294 (4th Dist. 2000) ("We reject the notion that the question of substantial probability under the Act can be reduced to mere percentages.") In particular, in *Hayes*, the court rejected the respondent's argument that the jury was required to find a probability of re-offense greater than 50%. *Hayes,* 321 Ill.App.3d at 189. Instead, the court determined that the phrase "substantially probable" in the Act meant "much more likely than not[,]" and emphasized that the definition could not be reduced to a mere mathematical formula or statistical analysis. *Hayes*, 321 Ill.App.3d at 188. The court explained that, instead of utilizing a mathematical formula, "the jury must consider all factors that either increase or decrease the risk of reoffending and make a commonsense judgment as to whether a respondent falls within the class of individuals who present a danger to society sufficient to outweigh their interest in individual freedom." *Id*. at 188.

¶ 82     When respondent sought to refer to a coin flip, he was asking Dr Arroyo to define his opinion as to "substantial probability" to a statistical analysis, which is exactly the type of questioning and argument that we have found to be inappropriate. Merely because he did not utilize a numerical percentage and, instead, asked the jury to consider 50-50 odds, does not persuade us. Moreover, in encouraging the jury to look at the evidence as a coin-flip, he was asking them to evaluate the

evidence, not based upon the evidence, but upon chance. We reject respondent's attempt to circumvent the use of mathematical formula or statistical analysis where, in the end, a coin flip is exactly the type of language that *Hayes* found to be improper.

¶ 83    Respondent also asks for us to find that the trial court abused its discretion when it precluded counsel from asking Dr. Suire, "Isn't it true that you recommended someone for commitment even though they had a score of 1?" According to respondent, this question should have been permitted because it would have shown that Dr. Suire was "biased" towards recommending people to be civilly committed where he testified that he considered his classification of respondent as "above average" risk category on the Static-99R test was significant to his recommendation for commitment.

¶ 84    Initially, we find that respondent forfeited review of his claim where he failed to make an offer of proof. By utilizing the phrase, "Isn't it true…" respondent suggested that there was evidence to support it. However, there was no offer of proof that Dr. Suire had recommended someone for commitment with a score of 1 on the Static-99 test. When a line of questioning is objected to or denied by the trial court, the defendant must ordinarily set forth an offer of proof to convince the trial court to allow the testimony. *People v. Burgess*, 2015 IL App (1st) 130657, ¶ 47. The purpose of an offer of proof is to inform the trial court, opposing counsel and a reviewing court of the nature and substance of the evidence sought to introduced (*People v. Leak*, 389 Ill.App.3d 798, 822 (1st Dist. 2010)) and for the reviewing court to determine if the exclusion of evidence was proper (*Tabb*, 374 Ill.App.3d at 689). When it is clear what a witness would say, or what the basis would be for saying it, the offer of proof must be considerably detailed and specific. *Leak*, 398 Ill.App.3d at 822. A formal offer of proof is not typically required, however an informal offer of proof involving counsel's summary of what the proposed evidence might prove may be sufficient

if specific and not based on speculation or conjecture. *Tabb*, 374 Ill.App.3d at 689. It is well-settled that the key to preserving for review an error in the exclusion of evidence is an adequate offer of proof in the trial court and a defendant's failure to make such an offer of proof results in forfeiture of the issue. *People v. Staake*, 2017 IL 121755, ¶ 51. Here, during the sidebar, counsel had the opportunity to provide an offer of proof but failed to do so. Consequently, respondent's failure to provide an offer of proof as to Dr. Suire's testimony amounted to forfeiture of his claim.

¶ 85    Even if we were to relax the forfeiture doctrine in order to review respondent's claim, we find that respondent has not established that the trial court abused its discretion. To determine the constitutional sufficiency of cross-examination, the court looks not to what the defendant was not allowed to ask, but rather what he was allowed to do, an inquiry made by looking at the entire record. *People v. Miller*, 225 Ill.App.3d 92, 102 (1st Dist. 1992). On direct examination, the jury heard that Dr. Suire had conducted approximately 800 evaluations in the state of Illinois, and that he found three or four of these 800 people did not meet the criteria as an SVP. During cross-examination, the trial court permitted respondent's counsel to extensively question Dr. Suire regarding all the different factors that he considered in making his determination as to the likelihood of respondent committing a sexual offense in the future. Dr. Suire testified, on cross-examination, that both tests he utilized had moderate predictive accuracy, that the tests stopped giving credit reduction after the respondent reached the age of 60, and that he gave respondent points for both prior convictions for sexual offenses as well as sex offenses that were dismissed. In short, respondent was able to cross-examine Dr. Suire about the different factors that he utilized in his evaluation procedures. Consequently, the trial court did not abuse its discretion in excluding cross-examination in this one particular area.

¶ 86                              **C. State's Closing and Rebuttal Arguments**

¶ 87 Respondent contends that the State compromised his right to a fair trial, pointing to several remarks during both the State's closing and rebuttal arguments. On the other hand, the State contends that none of these comments amounted to substantial prejudice and points out that respondent forfeited review of several comments by failing to properly preserve them. We find that the trial court did not abuse its discretion, and there was no error in the presentation of closing arguments.

¶ 88 Generally, the prosecution has wide latitude in making its closing argument. *People v. Willis*, 2013 IL App (1st) 110233, ¶ 101. Thus, the prosecutor may comment on the evidence and any "fair, reasonable inferences" from it. *Willis*, 2013 IL App (1st) 110233, ¶ 101. The prosecutor may also respond to comments made by defense counsel that clearly invite response, and comment on the credibility of witnesses. *People v. Cosmano*, 2011 IL App (1st) 101196, ¶ 57. Closing arguments must be viewed in their entirety, and allegedly erroneous arguments must be viewed in context. *People v. Nicholas*, 218 Ill.2d 104, 122 (2005). Thus, reviewing court will not focus on selected phrases or remarks in isolation but rather consider the closing argument as a whole. *Nicholas*, 218 Ill.2d at 122.

¶ 89 "'We will not interfere with the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant.'" *In re Commitment of Gavin*, 2014 IL App (1st) 122918, ¶ 49 (quoting *Willis*, 2013 IL App (1st) 110233, ¶ 102. Reversible error will be found only when a prosecutor's comments engender "substantial prejudice" against the defendant to the extent that "it is impossible to determine whether the verdict of the jury was caused by the comments or by the evidence." *Willis*, 2013 IL App (1st) 110233, ¶ 102.

¶ 90     Initially, respondent contends that the State committed error during rebuttal argument when it misstated the law regarding what constituted a mental disorder. In particular, the State argued:

> [PROSECUTOR:] We have proven to you that the respondent suffers from other specified paraphilic disorder. And [the prosecutor] was right, he does have to suffer from a mental disorder. It doesn't have to be a specific one but he does suffer from that one.
>
> Other specified personality disorder is also one. It can be one in conjunction. It can be one on its own if you find that. A mental disorder doesn't have to meet the definitions - -
>
> [RESPONDENT'S COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: -- under the act which you will receive in your jury instructions that has been discussed here. But you can also see is Dr. Arroyo talked to you how just the personality disorder alone was not a sufficient diagnosis for him. It didn't actually describe his behavior.
>
>                         ***
>
> …Both the other specified paraphilic disorder and the other specified personality disorder are mental disorders under the act and we have prove[n] that beyond a reasonable doubt…

¶ 91     Here, considering the totality of the comments, the State's comments did not amount to a deliberate attempt to misstate the law to the jury. The clarity of this comment is questionable when we consider that this comment was fragmented at the point when respondent's counsel objected. Also, we consider this comment in the context of the other arguments made by the State. This comment was followed by the State asking the jury to look at the jury instructions and then they argued that they had proven that defendant suffered from a mental disorder where he was diagnosed with other specified paraphilic disorder and the other specified personality disorder.

Moreover, in closing argument, the State also properly defined the law regarding mental disorders. Therefore, viewing this isolated comment in the context of the entire closing arguments, respondent has not shown prejudice.

¶ 92   Next, we find that the State's argument regarding the opinion evidence did not amount to error. Relying upon *Gavin*, respondent contends that he was prejudiced by the prosecutor's rebuttal argument where the prosecutor substantively argued the underlying facts of respondent's criminal convictions. Pointing to *In re Commitment of Tenorio*, 2020 IL App (1st) 182608, and *In re Commitment of Butler*, 2013 IL App (1st) 113606, the State argues that the prosecutor's comments were proper where focused on the underlying facts and circumstances of a respondent's criminal history as having been relied upon by the expert witnesses in supporting their opinion. We find that the facts here more closely align those found in *Tenorio* and *Butler* than *Gavin*, and therefore, conclude that the trial court did not abuse its discretion.

¶ 93   "It is well-settled that an expert may give opinion testimony that relies on facts and data not in evidence, as long as the underlying information is of the type reasonably relied on by experts in the particular field." *Tenorio*, 2020 IL App (1st) 182608, ¶ 43 (citing *In re Commitment of Hooker*, 2012 IL App (2d) 101007, ¶ 51. Moreover, although the expert is permitted to testify to the underlying facts or data, they are admitted for the limited purpose of explaining the basis for the expert's opinion, and "the basis of an expert's opinion must be presented to the jury as substantive evidence of the underlying assumptions." *Id*., ¶ 44 (citing *Butler*, 2013 IL App (1st) 113606, ¶ 31.

¶ 94   In *Gavin*, the prosecutor recounted the respondent's criminal history in detail during opening statements, closing argument, and rebuttal argument. We found that "the State repeatedly referred to the underlying facts as something other than the basis for the experts' opinions." *Id.* ¶ 73. For instance, the prosecutors argued that the experts were going to "tell" or "show" the jury about the

respondent's past sex crimes, referred to the hearsay evidence as "facts" and "evidence[,]" and "argued the explicit facts underlying [the respondent's] convictions as a narrative" and did not explain to the jury how the experts relied on these facts to diagnose or assess the respondent. *Id*. ¶¶ 73-74.

¶ 95       In *Butler*, however, we found that "the State argued the facts and circumstances of respondent's history of violent sexual offenses as having been relied upon and completely supporting the opinions of their expert witnesses." *Butler*, 2013 IL App (1st) 113606, ¶ 34. Likewise, in *Tenorio*, we found that the prosecutor's comments were proper where "the State focused on the fact that the experts had relied on the existence of a pattern of behavior and recited the details of respondent's prior offense in the context of describing that pattern." *Tenorio*, 2020 IL App (1st) 182608, ¶ 47. We also found that the prosecutor's comments in rebuttal were in direct response to defense counsel's arguments concerning the experts' credibility. *Id*. ¶ 48.

¶ 96       Here, unlike in *Gavin*, respondent does not contend that the State made any improper comments during opening statements or closing argument. In fact, during closing argument, the prosecutor recounted the relevant aspects of respondent's criminal history to explain Drs. Arroyo's and Suire's diagnosis. Instead, respondent focuses on comments made during rebuttal argument. The prosecutor, however, in rebuttal referred to the different facts from respondent's criminal history to explain the difference between the opinions of Drs. Arroyo and Suire versus Dr. Kane, the defense expert, as to why respondent was substantially probable to reoffend. The prosecutor argued that Dr. Kane's conclusion that respondent could not be diagnosed with other specified paraphilic disorder was "because he didn't have a pattern of behavior that suggested that he was interested in nonconsenting persons. That is absurd in light of the facts." At that point, the prosecutor referred to the different facts from respondent's criminal history to explain that there

was a "clear pattern of behavior." Because these comments were focused on explaining the difference between the opinions of the experts in this case, the prosecution did not improperly refer to the underlying facts as something other than the basis for the experts' opinion. Consequently, this case is more like the facts in *Tenorio* and *Butler*, where we found no error. Further, like in *Tenorio* and unlike in *Gavin*, the prosecutor's comments were in direct response to counsel's closing argument in which he spent a portion of his closing argument discussing the underlying facts of respondent's different criminal cases when trying to support Dr. Kane's diagnosis that respondent did not suffer from a paraphilic disorder and to discount the testimonies of Dr. Arroyo and Dr. Suire as to their diagnosis that he did. As a result, these comments were proper.

¶ 97    However, at the beginning of the rebuttal argument, the prosecutor discussed the underlying facts of respondent's criminal history without tying it to the diagnosis of the doctors. The prosecutor stated, "And let's talk about his age for just a second. Here are some ages, 69 years old, 78 years old, 80 years, 59 years old, 73 years old. Those are the ages of [respondent's] victims. All that's happened for the respondent now is that he is in the same age group." Respondent did not object to this comment, and, even if error to have made such an argument, it did not reach the level for us to conclude that it merited reversal of respondent's conviction. This comment was isolated and stands in sharp contrast to the repeated and pervasive arguments present in *Gavin*.

¶ 98    Furthermore, to the extent that there was any error, the trial court cautioned the jury four different times that this evidence was introduced for a limited purpose and may not be considered by them as evidence. It is well settled that jury instructions "carry more weight than the arguments of counsel." *People v. Boston*, 2018 IL App (1st) 140369, ¶ 103. For that reason, we have recognized that "[a] trial court's instructions that closing arguments are not evidence protect [a] defendant against any prejudice caused by improper comments made during closing arguments."

*Id*. "Absent some indication to the contrary, we must presume that jurors follow the law as set forth in the instructions given them." *People v. Wilmington*, 2013 IL 112938, ¶ 49. Unlike in *Gavin*, where we found that the prosecutors presented their arguments in such a way to rebut the presumption that the instructions were followed[,]" (*Gavin*, 2014 IL App (1st) 122918, ¶ 78), we find that, here, the prosecutors did not present their argument during rebuttal in such a pervasive and inflammatory manner to rebut this presumption.

¶ 99     Respondent also objects to two comments in rebuttal that we find were proper when considered in their proper context and that they directly responded to defense counsel's closing argument. First, respondent contends that the State "inflamed the passions of the jury" when it argued, in rebuttal, that "[Defense counsel] is right, this is more serious because the safety of the community is at issue." Specifically, the State argued:

> [PROSECUTOR]: …We talked about the age of the offenses and we've talked about his age and we have also talked about the fact that he is healthy and that he hasn't done any sex offender treatment. Those are the protective factors. They don't qualify for him.
>
> So the doctors have explained to you how he started at above average risk on those group estimates; and then, they looked at him as a person. We don't want to assess [respondent] using only those tools that are like for car insurance. [Defense counsel] is right, this is more serious because the safety of the community is at issue.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: Overruled.
>
> [PROSECUTOR]: We want them to go beyond. With the insurance company, they rate you; and then, you get a thing. They don't call you in and ask you to please talk about yourself and what you think about stuff. There isn't the second piece where they look at

your dynamic risk factors or your protective factors to see if your rates should be changed accordingly…

¶ 100     Notably, Dr. Suire testified that "An actuarial is a means of estimating risk. It's analogous to – Probably the most common thing we've all experienced is if you go to get car insurance…" Dr. Suire went on to explain that these types of actuarial instruments look at a variety of factors "to create what they call an actuarial table" to determine the cost. In closing argument, defense counsel argued that Dr. Suire compared the actuarial instrument as the ones "used on someone who is buying car insurance" but that "we have a bit of different situation here. We have an actuarial instrument being used to determine if someone's risk to reoffend in the future. And this is far more serious than any actuarial instrument that's used in car insurance because the question here is whether someone is eligible for civil commitment."

¶ 101     The comment was made in direct response to defense counsel's argument and to explain Dr. Suire's testimony regarding the use of actuarial instruments utilized by car insurance companies. Considering its proper context and that the comment was made in direct response to defense counsel's closing argument, the prosecutor did not inflame the passions of the jury by this line of argument.

¶ 102     Moreover, defense counsel argued that respondent was at less risk to reoffend because of respondent's age and "we tend to become weaker, more decrepit…" Defense counsel also argued that the jury should remember that "the question here is not whether [respondent] was a sexually violent person in 1967…in 1984. The question is whether he is a sexually violent person today in 2020 as an almost 73 year old man…" In rebuttal, the State argued that "nothing has happened over the course of the years but the passage of time. Nothing else has changed for him say for the fact that he [has] gotten older." The prosecutor continued, pointed out the ages of the victims and

argued, "Now if [respondent] were to be released, he can go down to the senior center and play bingo, he is playing in the victim profile. That's what [is] happening for [respondent]." Thus, in response to defense counsel's argument that respondent's age was a significant factor for the jury to consider in determining whether respondent was likely to reoffend, the prosecutor was merely pointing to the fact that the only thing that had changed for respondent since he was convicted of and incarcerated for these previous crimes was the fact that he had grown older and closer in age to the victims in his prior offenses. Respondent has not established that he was prejudiced by this comment.

¶ 103     Moreover, respondent contends that when the State referred to Drs. Arroyo and Suire as "our doctors" when discussing their testimony, it violated the State's motion *in limine* to preclude referring to the State's witnesses "as controlled experts." Prior to trial, the trial court granted the State's motion *in limine* to refrain from referring to the experts as the State's "retained or controlled expert witnesses." When the State referenced the two experts that they presented as "our doctors[,]" it did not in any way violate the trial court's order. The State sought to prevent respondent from attaching a pejorative description to the experts, and this particular reference did not in any way approach that concern.

¶ 104     Respondent also contends that the prosecutor improperly offered its opinion regarding respondent's health by stating that "[h]e is probably healthier than I am…" where this comment was "completely detached from evidence…" In substance, the State argued that all three experts took respondent's age into consideration when conducting the risk assessment, and "It's a factor that largely comes in concert with his physical condition. And this respondent is healthy. He is probably healthier than I am. He jogs, he circuit trains, he plays basketball, his medical records are clear…"

¶ 105    Initially, we reject respondent's suggestion that this comment was not based upon the evidence presented at trial. Dr. Arroyo testified that he looked at respondent's medical condition and, after looking at his medical file, found that "he's engaging in circuit training. He's bench-pressing. He's playing basketball. I don't see anything that's limiting his mobility - - physical ability." He concluded that there was nothing to indicate that respondent's physical condition "would prevent him from engaging in future acts of sexual violence." Respondent relies upon a mere snippet of the State's rebuttal argument, and considered in its proper context, we do not find that the jury would have been prejudiced by it. We also agree with the State's suggestion that the prosecutor's comparison of his own health with that of respondent was "possibly hyperbole," but do not encourage the State to continue to such a line of argument in the future.

¶ 106                                    **CONCLUSION**

¶ 107    For these reasons, the judgment of the circuit court is affirmed.

¶ 108    Affirmed.